No. 52,877

PHILLIP W. STANFIELD, *Appellee, Cross-Appellant,* v. OSBORNE INDUSTRIES, INC., *Appellant.*

(654 P.2d 917)

Opinion filed December 3, 1982.

*Don W. Noah,* of Noah & Harrison, P.A., of Beloit, and *Dorsey L. Baker,* of Haight, Hofeldt, Davis & Jambor, of Chicago, Illinois, argued the cause and were on the briefs for appellee, cross-appellant.

*James D. Oliver,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *Jerry G. Elliott,* of the same firm, *Malcolm Litman,* of Litman, Fisburn & Gold, of Kansas City, Missouri, and *Richard E. Dietz,* of Osborne, were with him on the briefs for appellant.

The opinion of the court was delivered by

McFARLAND, J.: This is an action by plaintiff, Phillip W. Stanfield, to recover royalties from defendant, Osborne Industries, Inc., under a patent licensing agreement. Stanfield and Osborne have each appealed the judgment of the trial court. The Court of Appeals essentially affirmed the trial court, but extended the

maximum period of time that royalties could be recovered. The case is before this court upon petitions for review from each appealing party.

Numerous issues have been raised in the appeal and cross-appeal herein. We are satisfied the Court of Appeals opinion herein, *Stanfield v. Osborne Industries, Inc.,* 7 Kan. App. 2d 416, 643 P.2d 1115 (1982), adequately disposed of all issues raised in the appeal and cross-appeal except the issue relative to whether the licensing agreement requires Osborne Industries to pay royalties on sales occurring after the date Stanfield's patent application was ultimately rejected by the United States Patent Office. We approve the Court of Appeals opinion as to such other issues and shall confine this opinion to said royalty issue.

Under such circumstances, the factual statement will be highly summarized. Stanfield, an Osborne County resident of limited formal education, was handy at making and repairing items in his backyard shop. Stanfield was aware of a long-standing problem of hog raisers—newly farrowed pigs being lain on and killed by the sow as they sought out her body heat. He designed a rigid heating pad that would provide adequate artificial heat for the baby pigs, but have the ability to withstand the severe environmental stresses inherent in such usage. He called this idea a "pork pad."

Stanfield presented this idea to some local Osborne businessmen and Osborne Industries was created. A licensing agreement was prepared by attorneys for both sides. The agreement gave Osborne exclusive right to manufacture certain items of animal heating equipment including the pork pad. After Stanfield came to work for Osborne, no new products were developed. Of the listed ideas, specifically referred to in the agreement, only the pork pad proved to be commercially acceptable.

By virtue of having affirmed the Court of Appeals on the other issues, the pork pad manufactured by Osborne will be considered for all purposes to be the original pork pad referred to in the licensing agreement. The matter of royalties on the pork pad is the sole issue before us.

Any right Stanfield has to receive royalties is wholly dependent upon the patent licensing agreement, an instrument the parties have stipulated is unambiguous. Regardless of the construction of a written instrument made by the trial court, on appeal the

instrument may be construed and its legal effect determined by the appellate court. *State Bank of Parsons v. First National Bank in Wichita,* 210 Kan. 647, 504 P.2d 156 (1972).

Where the provisions of a written contract are clear and unambiguous, there is no occasion for applying rules of construction. In such cases, the contract must be enforced according to its terms so as to give effect to the intention of the parties, and this must be determined from the four corners of the instrument itself. *Steel v. Eagle,* 207 Kan. 146, 483 P.2d 1063 (1971).

Although lengthy, the entire licensing agreement must be reproduced herein. When reading the agreement it is helpful to bear in mind the three constructions heretofore given the agreement relative to payment of royalties on the pork pads:

(1) Right to royalty was conditioned upon securing a patent. When the patent application was ultimately and finally denied on March 31, 1978, all right to future royalty payments ended (Osborne);

(2) Right to royalty payments would continue a maximum of 17 years from March 31, 1978, date of the denial of the patent (trial court); and

(3) Right to royalty is to continue however long Osborne manufactures pork pads (Stanfield and Court of Appeals).

The licensing agreement is as follows:

"LICENSE AGREEMENT

"THIS AGREEMENT, made and entered into as of this 3rd day of October, 1973, by and between Phillip W. Stanfield, of Alton, Kansas, hereinafter referred to as Stanfield, and Osborne Industries, Inc., hereinafter referred to as Industries:

"WITNESSETH THAT:

"WHEREAS, Stanfield is the inventor of certain new products, hereinafter described as follows:

"NOTE: All items listed below are intended to be constructed of fiber glass of PVC (poly-vinyl-chloride), high impact plastic that is corrosion and acid resistant. This plastic is important because of its ability to stay germ resistant.

"A. PORK PADS

"1. Stanfield Heat Pad for Farrowing Pigs - Designed to fit the various standard type 'A' house and Corner Pads triangle shaped to fit in corners of 'A' houses and farrowing pens.

"2. Half Pad - Made to heat an odd number of crates or make-shift pens.

"3. Five-foot Pad - This pad is for nurseries.

"B. PET EQUIPMENT

"1. Heat Pad for Pets Inside and Outside, which may be covered with cloth, - These will vary in size for the different uses intended.

"2. Heat Pad for Lap Dogs - made in an attractive shape and size for

indoor use which may be covered with cloth. Pads for cats and cat baskets will be constructed in the same manner.

"3.   Heated Dog Dish.

"4.   Heated Dog House or Floor for Existing Dog House.

"WHEREAS, Stanfield is ready, willing and able to grant unto Industries an exclusive license to manufacture, use and sell said above described products, at either wholesale or retail, under the terms and conditions hereinafter set forth:

"NOW THEREFORE, it is agreed by and between the parties hereto as follows:

"1.   Stanfield agrees to file one or more applications for U.S. Letters of Patent covering the above described products, to prosecute said applications before the United States Patent Office, and to cause issuance of Letters of Patent thereon upon allowance at his sole cost and expense, and furnish to Industries copies of each application and Letters [of] Patent issuing thereon, however, should Stanfield become financially unable to pay the cost and expense to prosecute said application before the United States Patent Office, Industries, at its discretion, may pay said patent or copyright expense and it shall be the duty of Stanfield to reimburse Industries for the reasonable cost and expense of the same and that Industries may deduct from royalty money due and owing to Stanfield, the cost of said expenses at the rate of Ten (10) percent of all royalty money payments due and owing according to this agreement as hereinafter described.

"2.   Upon the execution of this Agreement by the parties hereto, Industries shall proceed with the necessary arrangements for the manufacture of the products under this agreement, including the production or acquisition of all required tools, dies, jigs, fixtures and other equipment at its own cost and expense. All present and future tools, dies, jigs, fixtures and other equipment purchased or developed by Industries shall remain the sole property of Industries.

"3.   Any improvements made upon the items herein licensed to be manufactured which may be made for the purpose of extending or renewing a patent of Stanfield's, shall remain the sole property of Stanfield. All improvements in the methods of manufacture shall be the properties of Industries, whether made to reduce production costs, improve performance, increase service life, broaden applicability, increase marketability or improve appearance.

"4.   All tools, dies, jigs, fixtures and other equipment shall at all times be maintained in good repair and operating condition by Industries at its own expense and Industries shall at all times use its best efforts to produce, advertise, market, and sell the products herein licensed.

"5.   All products manufactured by Industries shall bear a distinctive mark and shall bear all marks required by the patent laws. In the event that any of these distinctive marks referring specifically to Stanfield products or used in connection with Stanfield products shall be registered as a trademark, Industries will be entitled to use said trademark in connection with this License Agreement and shall be required to use said mark in accordance with the trademark laws.

"6.   Industries hereby accepts the license hereinabove granted, subject to all the conditions expressed elsewhere in this Agreement, and in consideration therefore, agrees to pay to Stanfield a royalty of Five (5) percent of the net wholesale price of the above named products to which Stanfield hold[s] patents or copyrights or has patents or copyrights pending and those items, though not

patentable, which Stanfield has introduced and developed for Industries. The Five (5) percent shall be applicable to such products or merchandise actually billed by Industries to dealers, distributors, wholesalers, or individuals, as evidence[d] by Industries' invoices for the same and the royalty payments in the sum of Five (5) percent as above described shall be payable monthly in installments due and payable on the tenth day of each month subsequent to the month in which actual billing to the above described parties is made. It is understood and agreed that the royalty percentage shall be based upon the net wholesale price of each and every unit of products manufactured and sold as above described.

"7. The price received by Industries, F.O.B. factory, from its customers for the sale of said above described products shall be deemed to be the net wholesale price of Industries for the purpose of computing the royalties hereunder.

"8. All royalty payments shall be paid by the tenth day of the month following the month in which the product has been billed out and Industries shall at all times keep accurate accounts, rendering full statements thereof in writing to Stanfield at the time of making said payments. Such statement shall show the number of products sold during the preceding month and the basis upon which payment[s] have been computed. Industries shall permit Stanfield or his duly authorized representative to inspect said books of account[s] of Industries relating to said products at any reasonable time during regular working hours for the purpose of inspecting the same to verify the statements rendered to Stanfield by Industries.

"9. Stanfield shall have the right to institute or bring any action and proceeding against any person other than Industries or its assigns that Stanfield may be advised to institute or begin for, or by reason of, any infringement by other manufacturers of the above invention or Letters [of] Patent or for unfair trade practices by other manufacturers pertaining to the above patent, and, for that purpose, Stanfield shall have the right to use the name of Industries as a party plaintiff, either solely or jointly with Stanfield's name; provided, however, that such suit or suits shall be instituted, maintained and prosecuted solely at the cost of Stanfield, and all sums that may be recovered in any such suit or suits, whether by decree, judgment, settlement, or otherwise, shall be the sole and exclusive property of Stanfield. Should Stanfield be unable to maintain the above mentioned actions, Industries may do so upon giving Stanfield sixty (60) days written notice of their desire to maintain the action and all sums that may be recovered shall then be the sole and exclusive property of Industries.

"10. Industries agrees that this agreement shall terminate as to any one given product, Twelve (12) months after Industries, or its successors and assigns, fail to produce or sell such products but that this provision shall not be construed to terminate the entire agreement, provided however, that Industries continues to manufacture and sell other products as above set forth in this agreement and further Industries hereby agrees that upon the termination of this agreement, as above described, it shall forthwith cease to manufacture said products as specified by the Letters of Patent issued to Stanfield.

"11. If Industries fails to submit reports or make payments as hereinabove set forth, Stanfield may, at his option, terminate this agreement by One Hundred Twenty (120) days written notice to said party of the second part, provided, however, that said party of the second part may avoid such termination by making

the demanded payment plus 8% per annum interest and providing the required reports as above mentioned to Stanfield within Thirty (30) days after the date of such notice of termination.

"12. Industries shall not, either directly or indirectly, dispute or object to the validity of any Letters of Patent of Stanfield on said products as above described.

"13. Unless otherwise terminated in accordance with the terms and conditions hereinbefore set forth, this Agreement shall remain in full force and effect throughout the life of the U.S. Letters of Patent to issue from said applications as above described.

"14. Cancellation or termination of this Agreement in accordance with the terms and conditions herein set forth shall not relieve said party of the second part from the obligation to pay any royalties accruing to said party of the first part prior to the date of such cancellation or termination.

"15. This agreement or any rights hereunder shall not be assigned by Industries without the written consent of Stanfield.

"16. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their heirs, legal representatives, successors and assigns.

"IN WITNESS WHEREOF, the parties have hereunto executed this Agreement as of the day and year first above written.

/s/ Phillip W. Stanfield
Phillip W. Stanfield, Party of the
First Part
Osborne Industries, Inc.
By:
/s/ Stanley M. Thibault
President

Attest:
/s/ S. Windscheffel
Secretary"

The parties agree Stanfield had a duty to file and prosecute an application for a pork pad patent and to cause issuance of Letters of Patent upon allowance of a patent. They agree he duly sought a patent. The parties sharply disagree as to the contractual effect of the rejection of Stanfield's patent application by the federal authorities.

In determining the intention of the parties, reasonable rather than unreasonable meanings are favored. The court should avoid unreasonable interpretations where a contract provision is reduced to an absurdity and the parties' intent vitiated. *Jackson v. Farmer,* 225 Kan. 732, 594 P.2d 177 (1979).

Of particular significance is paragraph six of the agreement which provides in relevant part:

"6. Industries . . . accepts the license hereinabove granted . . . and in consideration therefore, *agrees to pay* to Stanfield a *royalty* of Five (5) percent of

the net wholesale price of *the above named products to which Stanfield hold[s] patents* or copyrights or has patents or copyrights pending *and those items, though not patentable, which Stanfield has introduced and developed for Industries."* Emphasis added.

The pork pads were in the category of "above named products" and were not products which Stanfield had introduced and developed for Industries. Items so developed for Industries were expressly made subject to royalty payments even though not patentable. No comparable provision exists in the contract as to the specifically named products.

Obtaining and defending the patent is a common thread throughout the entire agreement. Reference to patents appears at least once in eight of the sixteen numbered paragraphs. The agreement was to remain in full force "throughout the life of the U.S. Letters of Patent."

A patent is conferred upon the inventor by the federal government pursuant to Article I, § 8, of the United States Constitution, to provide the holder with an exclusive right to make, use and sell the invention in the market place for seventeen years. Black's Law Dictionary 1281 - 1282, (4th ed. rev. 1968), 35 U.S.C. § 154 (Supp. IV 1980). See also *Kreimer v. Midland Industries, Inc.,* 164 Kan. 325, 328, 188 P.2d 660 (1948).

Under the interpretation of the trial court, rejection of the patent application still affords Stanfield the same seventeen-year right to royalties as if his idea had been patentable. Under the interpretation of the Court of Appeals, Stanfield is potentially far better off having his application rejected than if he had been issued Letters of Patent. By state appellate judicial decree, he obtains exclusive rights to an idea in perpetuity—something that cannot be granted by federal patent authorities.

We conclude the reasonable and proper interpretation of the agreement from the four corners to be that the ultimate rejection of Stanfield's patent application by federal authorities on March 31, 1978, terminated all right of Stanfield to royalties on pork pads sold after that date in the absence of an express provision to the contrary. Of necessity, the case must be remanded to the trial court for mathematical computation of the royalties due from the cessation of royalty payments on December 31, 1976, through March 31, 1978.

The opinion of the Court of Appeals is reversed insofar as it is

inconsistent with this decision and affirmed as to all other issues. District court affirmed in part and reversed in part with directions.