234 Kan. 1031 (1984)
678 P.2d 169
EDITH HALL, Appellant,
v.
FRED H. MULLEN, et al., Appellees.
No. 55,768
Supreme Court of Kansas.
Opinion filed February 18, 1984.
Dennis R. Davidson, of Thompson, Arthur & Davidson, of Russell, argued the cause, and Marvin E. Thompson and Mark Arthur, Jr., of the same firm, were with him on the brief for the appellant.
Norbert R. Dreiling, of Dreiling, Bieker & Kelley, of Hays, argued the cause *1032 for the appellees Fred H. Mullen, Rose Mullen, Frances Polly Hall, William M. Hall, Thelma Walters, and Shirley Z. Hall a/k/a Shirley Hall. Glenn R. Braun, of Hays, was with him on the brief as guardian ad litem.
Edward Larson, of Jeter and Larson, of Hays, argued the cause and was on the brief for the appellees William Johnson, Jr., a/k/a Wm. Johnson, Jr., Elsie Hall, Harold E. Hall, T. Warren Hall, and Dorothy H. Hall Shumaker.
The opinion of the court was delivered by
SCHROEDER, C.J.:
This is an action by Edith Hall (plaintiff-appellant) to quiet title to oil, gas and mineral interests, including royalty interests, in a quarter section of land located in Ellis County, Kansas. The defendant-appellees claim an interest in royalties derived from oil and gas production on this quarter section under a royalty pooling agreement entered into by the parties or their predecessors in title on May 6, 1942. The appellant contends the appellees' interests under the pooling agreement have expired, or, in the alternative, that the appellees' interests were terminated by the execution of a prior quitclaim deed. The trial court rejected the appellant's arguments and denied her request to quiet title. The appellant challenges the construction given various written instruments by the trial court. She also contends the court erred in considering parol evidence to interpret these instruments.
The case was submitted to the trial court on facts stipulated by the parties. The North Half (N/2) of Section Two (2), Township Twelve (12) South, Range Seventeen (17) West of the 6th P.M., Ellis County, Kansas (hereinafter referred to as the N/2 of Section Two), was owned in fee simple by John Hall who died testate on December 8, 1927. At the time of John Hall's death he owned approximately 4,320 acres of real estate in Ellis County. He was survived by his wife, Sarah, and six children. The will of John Hall provided that the N/2 of Section Two, along with his other land, be left to his wife for her lifetime, with the remainder in fee to the executors of the estate, in trust, with directions that the real estate be sold at its appraised value for the benefit of the children. The will also directed that two of the decedent's sons, Robert Hall and Frank Hall, be given the privilege of buying a quarter section each of the N/2 of Section Two at the appraised value.
The widow and six children entered into three successive agreements for the pooling of oil and gas royalties received from the production of oil and gas on the tracts of land covered by the *1033 agreements, which included the N/2 of Section Two. The first agreement was of limited duration and was expressly cancelled and rescinded by the second agreement. The second agreement was also limited in duration, but insofar as it was perpetuated by production of oil, its provisions were incorporated into the third pooling agreement. The last of these agreements was entered into on May 6, 1942. At that time oil was being produced on the Northwest Quarter (NW/4) of Section Two under a base lease with Cities Service Oil Company entered into in 1937 which covered the entire N/2 of Section Two. Production on the NW/4 has been continous to the present date. Although many dry holes were drilled on the NE/4 of Section Two, no production of oil or gas was obtained until November 1980. The oil and gas lease of April 29, 1937, covering the NE/4 was released by Cities Service on December 3, 1958. The oil discovered in 1980 on the NE/4 of Section Two was under an entirely new oil and gas lease.
The 1942 pooling agreement provided that royalties received or payable from the land covered by the agreement would be divided in seven equal parts during the lifetime of Sarah Hall, and after her death divided in six equal parts among the children. The agreement provided it was to remain in effect for a period of ten years for all the land covered by the agreement, and thereafter would continue to be in force as to each quarter section of land from which oil or gas is being produced. These provisions were modified by the last paragraph of the agreement, which reads:
"It is further agreed and understood by and between the parties hereto that should more than one quarter section of any of the real estate hereinbefore described be included in and held by a single basic oil or gas lease thereon, then production of oil or gas from any one of such quarters shall be deemed production from all of the real estate from said basic oil and gas lease." (Emphasis added.)
The agreement stated it was the express intent of the parties to make an equal division of oil and gas royalties derived from production on the property covered thereby, and to abide by the terms and conditions of the will of John Hall, modified only by the pooling of the oil and gas interests. In reference to the specific provisions of the will the agreement provided:
"In the event that during the life of this contract, Robert Lee Hall and Frank Hall, or either of them, exercises the option of purchase of any of the land hereinbefore described as provided for in the will of said John Hall, deceased, *1034 and in accordance with the terms of said will, at the appraised value of said lands, it is expressly understood and agreed by and between the parties hereto, that the appraisal of said lands shall be on the basis of the agricultural and grazing value only thereof, and that the value of said lands as fixed by said appraisal shall not be enhanced or increased to any degree or extent by reason of any value of said lands for royalty or leases for oil or gas purposes and that in such appraisal no oil or gas rights in said land shall be taken into consideration."
Following the death of Sarah Hall the Probate Court of Ellis County on August 18, 1950, approved the purchase of the NE/4 of Section Two by Robert Hall and the purchase of the NW/4 by Frank Hall. These purchases were made pursuant to a family agreement entered into by the remaining six children of John Hall, after the death of Sarah Hall, wherein they consented to the exercise of the options to purchase the real estate by Frank and Robert Hall as provided for in the will of John Hall. The amounts paid by Robert Hall and Frank Hall for the purchase of the two quarter sections were acknowledged by this family agreement as being the value of the surface rights. This family agreement also provided that in further consideration for the right to purchase the property Robert Hall and Frank Hall would each convey to the other five children by mineral deed a five-sixths (5/6) interest in the oil, gas and other minerals in and under his respective quarter section for a period of fifteen years and as long thereafter as oil, gas or other minerals are being produced. This provision was adopted by the probate court in its decree which directed that upon delivery of "a good and sufficient deed" conveying the quarter sections, and its approval by the court, Robert Hall and Frank Hall were required to execute and deliver the mineral deeds as agreed upon in the family agreement.
On August 19, 1950, three of John Hall's children, Belle Bellman, Grace Lightner and Lizzie Johnson, executed a quitclaim deed conveying the NE/4 of Section Two to Robert Hall. On August 22, 1950, John Hall's remaining three children, Robert Hall, Frank Hall and William Hall, acting as executors of the estate of John Hall, executed a warranty deed conveying the NE/4 to Robert Hall. On September 27, 1950, Robert Hall and his wife Edith, the appellant, executed and delivered an instrument entitled "Sale of Oil and Gas Royalty" to the other five children of John Hall, conveying an undivided five-sixths (5/6) interest in the NE/4 of Section Two "in and to all oil, gas and other minerals in and under and that may be produced" during *1035 the term of the instrument. The term of the instrument was limited to a period of fifteen years and as long thereafter as oil or gas or other minerals were produced from the property. It is conceded by all the parties that the interests created by this instrument have expired, as no oil, gas or other minerals were produced on the NE/4 during the primary term of fifteen years as set forth in the mineral deed.
The appellant is the widow of Robert Hall. The defendants are successors in title to the estate of John Hall and to the remaining five children of John Hall. The appellant contends the 1942 pooling agreement, insofar as it covered the NE/4 of Section Two, expired by its own terms in 1958 when Cities Service Oil Company released the NE/4 from the gas lease covering the N/2 of Section Two. The appellant further contends that if the appellees' interests in the royalties derived from this quarter section have not expired under the pooling agreement, to the extent the appellees' claims are based on the interests of Belle Bellman, Grace Lightner and Lizzie Johnson, they were terminated by the quitclaim deed executed August 19, 1950. The appellees, on the other hand, claim their interest in the oil and gas royalties under the 1942 pooling agreement have not expired and were not extinguished by the warranty deed executed by the executors of the estate to Robert Hall or the quitclaim deed, which were intended to convey surface rights only.
At the outset it is appropriate to mention the applicable standard of appellate review. This case was submitted to the trial court on an agreed stipulation of facts and documentary evidence and therefore on review this court has the same opportunity to consider and evaluate the evidence as the trial court. Cosgrove v. Young, 230 Kan. 705, 716, 642 P.2d 75 (1982); Stith v. Williams, 227 Kan. 32, Syl. ¶ 1, 605 P.2d 86 (1980); Crestview Bowl, Inc. v. Womer Constr. Co., 225 Kan. 335, Syl. ¶ 1, 592 P.2d 74 (1979). Regardless of the construction of a written instrument made by the trial court, on appeal the instrument may be construed and its legal effect determined by the appellate court. Stanfield v. Osborne Industries, Inc., 232 Kan. 197, Syl. ¶ 1, 654 P.2d 917 (1982).
In briefing this case on appeal the parties and their counsel seem to be preoccupied by ambiguity stemming from the provisions of the pooling agreement executed in 1942. They place *1036 little emphasis on the series of agreements entered into and deeds executed by the parties' predecessors in title in 1950 resulting in the conveyance of the NE/4 to Robert Hall. However, we find this series of transactions terminated the rights of the parties under the pooling agreement in and to the NE/4, and therefore is dispositive of the issues raised. While the language "held by a single basic oil and gas lease thereon" contained in the 1942 pooling agreement may be construed in two different ways, depending upon the time the instrument is to be construed, this ambiguity is immaterial to a resolution of the dispute between the parties.
The trial court held the quitclaim deed executed by the three children conveyed only their interests in the real property, and did not purport to terminate their personal property interests in the oil and gas royalties created by the pooling agreement. The court found there was no intent on the part of these three children to relinquish any rights under the pooling agreement. In reaching this conclusion the trial court considered two letters written in 1950 by an attorney for the executors of the estate of John Hall and addressed to Belle Bellman. The first letter stated, in pertinent part:
"You understand that Frank and Bob have agreed to deed royalty back, as stated in the paper you last signed, to you girls and William."
The second letter expanded on this statement, reading in part:
"I am enclosing to you herewith two quit claim deeds for execution ...; these deeds are self explanatory, and are designed to convey the interests of you girls in the trust lands; thus making more perfect the title to Frank and Bob in the trust lands, described in these deeds. We have sent an executor's deed to William for his execution, and this deed will also be executed by Bob and Frank. All three of them as executors will by the executor's deed convey this land to Bob and Frank. The executors will then make distribution of the proceeds of the sale of the trust lands....
"As soon as we get the title to this land Bob and Frank are required to execute royalty deeds called for in the last paper you signed."
The trial court further held that pursuant to the terms of the 1942 pooling agreement Robert Hall and Frank Hall purchased only the surface rights to the N/2 in 1950 and therefore the royalty rights provided for by the agreement were not relinquished or affected by the conveyance of this property to the two brothers.
The instant case involves several written instruments which were signed and executed by the parties as a part of the same *1037 transaction intending to convey the NW/4 to Frank Hall and the NE/4 to Robert Hall from the estate of John Hall. These include the family agreement entered into by the six children of John Hall approving the conveyance of the N/2 to Robert and Frank Hall, the quitclaim deed executed by three of the children, the warranty deed executed by the other three children as executors of the estate of John Hall, and the mineral deed conveying a five-sixths (5/6) interest in the minerals in place executed by Robert Hall and the appellant back to the other five children. This transaction was approved by the Probate Court of Ellis County in its decree entered August 18, 1950, pursuant to the petition filed by Frank and Robert Hall seeking final disposition of the trust estate of John Hall.
In actions founded upon written instruments, where the rights of parties relative to the terms thereof are in controversy, certain fundamental legal concepts permeate the law, and with minor variations it matters not whether the instrument be a contract, a deed or a will. The doctrine has been well established and frequently applied that where parties have carried on negotiations, and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contract between them and determines their rights. Custom Built Homes Co. v. State Comm. of Rev. and Taxation, 184 Kan. 31, 37, 334 P.2d 808 (1959); Weiner v. Wilshire Oil Co., 192 Kan. 490, 495, 389 P.2d 803 (1964). The interpretation of a written contract which is free from ambiguity is a judicial function and does not require oral testimony to determine its meaning. Craig v. Hamilton, 213 Kan. 665, 667, 518 P.2d 539 (1974); Schnug v. Schnug, 203 Kan. 380, 382, 454 P.2d 474 (1969). Ambiguity in a written instrument does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. Robertson v. McCune, 205 Kan. 696, 700, 472 P.2d 215 (1970). If a written contract is actually ambiguous concerning a specific matter in the agreement, facts and circumstances existing prior to and contemporaneously with its execution are competent to clarify the intent and purpose of the contract in that regard but not for the purpose of varying and nullifying its clear and positive provisions. Crestview Bowl, Inc. *1038 v. Womer Constr. Co., 225 Kan. at 340; First Nat'l Bank of Olathe v. Clark, 226 Kan. 619, 624, 602 P.2d 1299 (1979); Amortibanc Investment Co. v. Jehan, 220 Kan. 33, 43, 551 P.2d 918 (1976); Custom Built Homes Co. v. State Comm. of Rev. and Taxation, 184 Kan. at 37. Furthermore, where two or more instruments are executed by the same parties at or near the same time in the course of the same transaction and concern the same subject matter, they will be read and construed together to determine the intent of the parties. Amortibanc Investment Co. v. Jehan, 220 Kan. at 43; Cline v. Angle, 216 Kan. 328, Syl. ¶ 7, 532 P.2d 1093 (1975).
In Brewer v. Schammerhorn, 183 Kan. 739, 745, 332 P.d 526 (1958), this court was confronted with the construction of deeds affecting title to real estate, and said:
"In general, the intention of the parties as duly ascertained will determine the question as to the quantity of land conveyed by a deed. So, where an intent to convey the entire interest of the grantor is clear from the whole deed, the instrument should be so construed as to effectuate such intent. Again in such cases the rules apply that, where the description is of doubtful character, the instrument shall be construed against the grantor and in favor of the grantee. There is a presumption that a grantor intends to convey his entire interest, and a deed will be taken to convey the entire property and interest of the grantor in the premises unless something appears to limit it to a lesser interest.
"Where the description of the land in a deed is uncertain or ambiguous as to the quantity conveyed, which is latent in character as here, it is proper for courts to resort to parol evidence, not to contradict the instrument but to explain the ambiguity or uncertainty, in order to show the situation and condition existing upon the property conveyed, the circumstances under which the conveyance was made and the practical construction put upon the conveyance by the parties for the purpose of ascertaining their intention. This inquiry should be confined to the time of the execution of the deed without reference to subsequent circumstances."
The provision contained in the 1942 pooling agreement which modified the will of John Hall by establishing that the appraisal of the NW/4 and NE/4 for purchase by Robert and Frank Hall would be based only upon the agricultural and grazing value of the land, and the subsequent family agreement entered into in 1950 acknowledging the purchase of these two quarter sections by Robert and Frank Hall at the value of the surface rights, rendered these documents ambiguous as to the quantity of land conveyed. Did the conveyances of the two quarters include the mineral rights or only the surface rights? Further ambiguity exists in the construction of these instruments because none of *1039 them refer to the pooling agreement in effect when the property was conveyed or indicate the effect of the conveyance of the N/2 on the terms of the agreement. Therefore, facts and circumstances existing prior to and contemporaneously with the execution of these instruments are admissible to clarify the intention of the parties. In addition, the instruments executed in 1950 were all part of the same transaction intending to convey the property in question to the two brothers and therefore must be construed together to determine the intent of the parties to the transaction. Just as the meaning of a written contract should not be ascertained by a critical analysis of a single or isolated provision, but by a consideration of all the pertinent provisions, the quitclaim deed involved here may not be singled out and held to be dispositive of the issue of the parties' intent. Rather, the provisions of these instruments must be considered equally and construed in harmony with each other.
At the time of the conveyance of the N/2 to Robert and Frank Hall the 1942 pooling agreement was still in effect under the ten-year term provided for therein. Prior to that time, upon the death of Sarah Hall, title to the N/2, along with the other tracts of land formerly owned by John Hall, vested in fee simple in the executors of the estate of John Hall as trustees. The executors of the estate, as evidenced by the warranty deed conveying the property to Robert Hall, were the three sons of John Hall  Frank, Robert and William. The only interest which the other children, Belle Bellman, Grace Lightner and Lizzie Johnson, retained in the property held in fee simple by the executors of the estate at that time was the right to share in royalties derived from production of oil on certain properties created by the 1942 pooling agreement, and to share equally in the proceeds from the sale of such property. However, Frank and Robert Hall had an interest in a quarter section each of the N/2 of Section Two, pursuant to the provisions of the will of John hall granting them an option to purchase this property from the estate at its appraised value. This interest was recognized by the family members in the provisions of both the 1950 family agreement approving the exercise of the option to purchase by the two brothers and the prior 1942 agreement. The petition filed by Frank and Robert Hall seeking final disposition of the trust estate and to purchase the N/2 of Section Two referred to the *1040 aforementioned provision in the pooling agreement recognizing the brothers' right to purchase the property from the estate under the provisions of the will.
The appellees contend the interests created by the pooling agreement and mineral deed were separate and distinct, and therefore the execution of the mineral deed and its subsequent expiration in no way affected the preexisting and continuing royalty interest created by the pooling agreement. This contention is necessarily based in part on the appellees' position that the quitclaim deed executed by three of the children did not convey to Robert Hall their royalty interest in the NE/4. However, this position overlooks one significant point: the only interest which the three children had in and to the property at the time the quitclaim deed was executed was the right to share in the royalties from the NE/4. To say this deed did not convey to Robert Hall the royalty interests held by these persons under the pooling agreement would render its execution a nullity. It was the only interest they had in the property which they could transfer.
When the execution of this deed is viewed in light of the other instruments executed at the time its purpose becomes even more clear. The key is found in one of the letters complained of by the appellant, wherein it is stated:
"[T]hese deeds ... are designed to convey the interests of you girls in the trust lands; thus making more perfect the title to Frank and Bob in the trust lands ... We have sent an executor's deed to William for his execution, and this deed will also be executed by Bob and Frank. All three of them as executors will by the executor's deed convey this land to Bob and Frank."
It is evident the parties to this transaction and their attorneys believed the deed executed by the three sons of John Hall, as executors of the estate, would sufficiently convey their entire interests in the property to Frank and Robert Hall, but as a cautionary measure, the three daughters should execute a quitclaim deed to convey their interest in the trust land to make "more perfect" the title to the two brothers. No mention is made anywhere of any interest in royalties under the pooling agreement being reserved to any of the children; the clear intent was to deliver a perfect title to the brothers, without reservations.
Furthermore, as pointed out by the appellant, K.S.A. 58-2202 provides every conveyance of real estate shall pass all of the *1041 estate of the grantor therein, unless the intent to pass a lesser estate expressly appears or is necessarily implied in the terms of the grant. See also Gotheridge v. Unified School District, 212 Kan. 798, 802, 512 P.2d 478 (1973); Fast v. Fast, 209 Kan. 24, 26, 496 P.2d 171 (1972); Stratmann v. Stratmann, 6 Kan. App.2d 403, 407, 628 P.2d 1080 (1981). In Fast the court pointed out it is assumed that under the statute a general warranty deed carries with it all the grantor's interest  even in a severed mineral estate  unless the terms of the grant unmistakably negate such intent. 209 Kan. at 28-29.
The fact the six children of John Hall held a royalty interest rather than a mineral interest under the pooling agreement is immaterial. The children executing the quitclaim deed had no interest in the property to convey other than the royalty interest. The other children, as executors of the estate, did not reserve an interest to themselves nor make any mention of the pooling agreement which could be said to imply such a reservation. These children thereby conveyed their existing interest in the royalties produced from the NE/4 to Robert Hall. Accordingly, it appears the parties intended to relinquish the royalty interest created by the pooling agreement at the time of the purchase of the property by Robert Hall.
This intent is further confirmed by the stipulation in the family agreement and its approval by the probate court that Robert Hall deed back a five-sixths (5/6) interest in the minerals in place to the other five children. The appellees contend the royalty interests under the pooling agreement were reserved because pursuant to the pooling agreement and family agreement the amount paid for the purchase of the property was the value of the surface rights. However, the provisions contained in the family agreement make it clear that as consideration for the right to purchase the NE/4 at its appraised surface value Robert Hall was required to grant an undivided five-sixths (5/6) interest in the minerals in place for a term of years to the other five children. The purchase price was not based on the surface value of the property because of the existing royalty interest of the other children, as the appellees would have us believe. Rather, a defeasible term interest in the minerals in place was granted to the other children in exchange for the lower price.
The mineral deed executed by Robert Hall and the appellant *1042 to the other children was made subject to the existing oil and gas lease on the property. As such the six children could not have leased their right under the mineral deed to explore or drill for oil or gas and were only entitled to share in the royalties derived from production, if and when it was obtained. See, e.g., Stratmann v. Stratmann, 204 Kan. 658, 663, 465 P.2d 938 (1970). If this right already existed under the pooling agreement, as the appellees contend, the execution of the mineral deed would have had no purpose in that it would not have given the grantees any rights which they did not already possess. Such interpretation of the transaction reduces the execution of the mineral deed to a meaningless act. Such an interpretation is unreasonable and should be avoided where a more practical and equitable construction can be adopted. It is only reasonable to believe the parties to these transactions intended to extinguish their rights under the pooling agreement in exchange for the determinable term interest in the minerals in place created by the mineral deed.
A situation similar to the instant case was involved in Garza v. De Montalvo, 147 Tex. 525, 217 S.W.2d 988 (1949). There a widow and her ten children, as joint owners of a tract of land, entered into an oil and gas lease covering the entire tract. Following the mother's death the ten children voluntarily partitioned their interest in the land covered by the lease. The partition agreement did not specifically mention the mineral estate in the land and made no reference to the lease. Subsequently the lessee obtained production on part of the land covered under the lease and paid royalties to the children upon whose segregated tracts the producing wells were located. The children whose tracts had not been developed sued for an apportionment of the royalties derived from the producing tracts, claiming that under the lease as it was originally executed each of the lessors was entitled to share in royalties produced anywhere on the original tract. The court held the partition agreement was intended to and did segregate the mineral interests of the parties as well as the surface fee, including the possibilities of reverter and the royalty interests. Commentators on this subject have recognized the soundness of this result. See, e.g., Hoffman, Voluntary Pooling and Unitization, pp. 75-80, 182-86 (1954). See also 2A Summers, Oil and Gas § 612 (1958); Japhet v. *1043 McRae, 276 S.W. 669, 670 (Tex. Com. App. 1925); Mueller v. Sutherland, 179 S.W.2d 801, 803 (Tex. Civ. App. 1943). In Hover v. Cleveland Oil Co., 150 Kan. 531, 95 P.2d 264 (1939), owners of neighboring tracts executed agreements with each other and their lessee whereby they agreed the two tracts be developed as a unit and the royalties be shared in proportion to the acreage of their respective tracts "until changed by the parties [thereto]." Although one of the tracts ceased production the lessors continued to share royalties from production on the other tract. The owner of the nonproducing tract subsequently conveyed it, but claimed she was still entitled to share in royalties under the agreement from production on the other tract. The court rejected this claim, holding the plaintiff no longer had anything to contribute to the pool of possible royalties and therefore her right to receive royalties under the agreement had been extinguished by her conveyance of the property.
The transactions culminating in the conveyance of the NE/4 to Robert Hall and the conveyance of the mineral deed by him and the appellant back to the other children was intended to and did supersede the rights and interests of the children created by the pooling agreement.
The judgment of the lower court is reversed with directions to quiet title in the appellant.
HOLMES and HERD, JJ., concurring.