Phillip W. **STANFIELD**, Plaintiff,

v.

**OSBORNE INDUSTRIES, INC.**, Stanley M. Thibault and Ronald Thibault, Defendants.

No. 92–4048–RDR.

United States District Court, D. Kansas.

Dec. 23, 1993.

Don W. Noah, Noah & Harrison, P.A., Beloit, KS, Dorsey L. Baker, Lubbock, TX, for plaintiff.

John J. Murphy, James D. Oliver, Foulston & Siefkin, Wichita, KS, for defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

Plaintiff brings this action against the defendants alleging two claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and various supplemental common law claims. Plaintiff's claims arise from the defendants' use of "Stanfield" in two trademarks they have registered with the United States Patent and Trademark Office. This matter is presently before the court upon defendant's motion for summary judgment. The court has heard oral argument and is now prepared to rule.

The three counts alleged in plaintiff's complaint are as follows: (1) a claim for unfair competition under 15 U.S.C. § 1125; (2) a claim for fraudulent procurement of a federal trademark registration under 15 U.S.C. § 1120; and (3) claims of trademark infringement, disparagement, slander and misappropriation of plaintiff's name. The defendants' motion for summary judgment is directed at Counts 1 and 2.

In considering the defendants' motion for summary judgment, the court must examine all the evidence in the light most favorable to the plaintiff. *Barber v. General Electric Co.,* 648 F.2d 1272, 1276 n. 1 (10th Cir.1981). Summary judgment is proper only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under this rule, the initial burden is on the moving party to show the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party's burden may be met when that party identifies those portions of the record which demonstrate the absence of a genuine issue

of material fact. *Id.* at 323, 106 S.Ct. at 2552.

Once the moving party has met these requirements, the burden shifts to the party resisting the motion. The non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. The party resisting the motion "may not rest upon the mere allegations or denials of his pleadings ..." to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of a scintilla of evidence will not avoid summary judgment; there must be sufficient evidence on which a jury could reasonably find for the nonmoving party. *Id.* at 251, 106 S.Ct. at 2511 (quoting *Improvement Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)).

Many of the facts pertinent to this case are not in dispute. In their motion for summary judgment, defendants stated 35 uncontroverted facts. Plaintiff has attempted to controvert only five of these facts.[1] The court will initially provide a summary of the facts that are not in dispute and then discuss facts that remain in dispute as we consider the arguments of the parties.

Plaintiff is 62 years old and lives in Osborne, Kansas. He has an eighth grade education. In 1972, plaintiff developed several products, including a fiberglass heating pad for hogs. On December 6, 1972, he wrote the president of the First State Bank in Osborne with certain ideas he had for manufacturing agricultural products, including the heating pad for hogs. At the top of the letter appeared the words "Stanfield Products." Plaintiff has indicated that he was not in the business of manufacturing these products at the time of the letter, but that he expected to call his business "Stanfield Products" if he went into business. He subsequently presented his ideas to some Osborne businessmen, and defendant Osborne Industries, Inc. (OII) was thereafter created. In March 1973, the organizers of OII contacted defendant Stanley Thibault about becoming involved in a new company that would manufacture agricultural products. On May 15, 1973, OII was incorporated. In September, Stanley Thibault moved to Osborne to head up OII. The only products that OII had to manufacture and sell at the beginning were those that had been developed by plaintiff.

Plaintiff became employed by OII in September 1973. On October 3, 1973, plaintiff entered into a contract with OII in which he agreed to allow OII to manufacture certain products that he had invented, including the hog heating pad, in exchange for a royalty on sales.

In the first year of production of the heating pads, OII made most of the pads for another company, Moorman Manufacturing Company, and affixed that company's name to them. OII also sold heating pads with the name "Stanfield" on them. Plaintiff had no objection to the use of his name on those pads.

In April 1974, defendant Ronald Thibault undertook several projects for OII. He designed a full line of heating pads, changed the material composition of OII's heating pads, and persuaded Moorman to order a large quantity of heating pads from OII for the 1974–75 season. In March 1975, Ronald Thibault began working full time for OII. Ronald Thibault determined that it was time for OII to reduce its dependence on Moorman and develop its own markets, reputation and identity. He concluded that in order to do this, OII needed to develop and consistently use its own trademark. Plaintiff became agitated when he learned of this plan and threatened a walkout of OII employees if the word "Stanfield" was not used in OII's trademark. Ronald Thibault, after discussion with Stanley Thibault, determined that "Stanfield" would be acceptable because

---

**1.** Plaintiff has suggested in his response to the defendants' motion that a pending discovery matter has precluded him from bringing some matters to the attention of the court. Such a statement is insufficient to excuse a party from presenting evidence to oppose a motion for summary judgment. *See* Fed.R.Civ.P. 56(f). *Also see Dreiling v. Peugeot Motors of America, Inc.,* 850 F.2d 1373, 1376 (10th Cir.1988) (The non-moving party must file "an affidavit explaining why he or she cannot present facts to oppose the motion.").

"Stan" was the first name of OII's president (Stanley Thibault) and "field" had an agricultural connotation.

Thereafter, in July 1975, plaintiff and OII entered into an agreement designated as a "License Agreement." This agreement provided as follows:

THIS AGREEMENT, made and entered into as of this 5th day of July, 1975, by and between Phillip W. Stanfield, of the County of Osborne, State of Kansas, hereinafter referred to as First Party, and Osborne Industries, Inc., hereinafter referred to as Second Party:

WITNESSETH THAT:

WHEREAS, Second Party is manufacturing certain products of which First Party is the inventor as enumerated in a certain License Agreement by and between said parties dated the 3rd day of October, 1973, and

WHEREAS, Second Party is manufacturing certain products other than invented by First Party, and

WHEREAS, Second Party desires to use the name "Stanfield" on all or part of the products manufactured by Second Party whether or not the same be invented by First Party, as a distinctive mark on said products in conjunction with the name of said products, and

WHEREAS, Second Party desires to use the name "Stanfield" as a distinctive mark on all or part of its products manufactured, at its discretion for a period of Fifteen (15) years from the date of this agreement and that said design of the distinctive mark bearing the name "Stanfield" shall be at the sole discretion of said party of the Second Part as to the design of the same, and

WHEREAS, both parties agree that all products manufactured by Second Party shall bear a distinctive mark and shall bear all marks required by the patent laws pertaining to and in conjunction with a License Agreement between the parties entered into on the 3rd day of October, 1973, and in the event that any of these distinctive marks referring specifically to "Stanfield" products or used in connection with "Stanfield" products shall be registered as

a trademark, Second Party will be entitled to use said trademark in connection with the License Agreement dated the 3rd day of October, 1973 by and between the parties and shall use said mark in accordance with the trademark laws.

WHEREAS, in consideration of the use of the name "Stanfield" as above described in this Agreement in regard to any or all products manufactured by Second Party, the sum of $75.00 shall be paid to First Party by Second Party for the use of said name as above described.

This Agreement shall inure to the benefit of and be binding upon the Parties hereto, their respective heirs, legal representatives, successors and assigns.

OII then hired an artist to design trademarks incorporating the word "Stanfield." The artist ultimately developed two marks that OII found acceptable—one involved a printing of the word "Stanfield" to be embossed on OII products, and the other was a circle design that incorporated the word "Stanfield." Plaintiff had no involvement in the design of these marks.

On September 23, 1975, plaintiff resigned from OII due to illness and his dissatisfaction with the way things were being run. In February 1976, plaintiff's application for a patent on his heating pad was rejected. By September 1976, OII was using the word "Stanfield" on certain of its products. OII was also using the word on its labels and other promotional materials. In December 1976, OII stopped paying royalties on the sales of heating pads.

In March 1977, OII applied for registration of its trademarks with the United States Patent and Trademark Office. In its applications, Stanley Thibault stated that to the best of his knowledge and belief no other person had the right to use these marks in commerce. In October 1977, the United States Patent and Trademark Office gave notice of publication of OII's circle design, and on January 24, 1978, the mark was registered on the Principal Register.

Plaintiff filed a lawsuit in state court against OII in February 1977. Plaintiff was represented by the same two attorneys who

represent him in this lawsuit. In that action, plaintiff alleged that OII had breached the 1973 agreement by failing to pay him royalties. He further alleged that, under the July 1975 agreement, the use of the word "Stanfield" was conditioned upon payment of the product royalties and that, given OII's refusal to pay, its use of the word "Stanfield" constituted unjust enrichment. Plaintiff submitted interrogatories asking whether OII had ever registered any trademarks including the word "Stanfield." In its responses, OII indicated that it regarded the July 1975 agreement as a release and that it had registered the word "Stanfield" with the United States Patent and Trademark Office. Plaintiff's counsel were also served with copies of OII's trademark applications during that litigation. During the trial of the case, Stanley Thibault testified that OII had registered its "Stanfield" trademark, and he displayed a copy of the trademark to the court and jury. The jury returned a verdict for the plaintiff, but this verdict was reversed by the Kansas Supreme Court. *See Stanfield v. Osborne Industries, Inc.*, 232 Kan. 197, 654 P.2d 917 (1982). The Supreme Court determined that OII was not obligated to continue to pay the plaintiff royalties after plaintiff's patent application for the hog heating pad was denied. *Id.*, 654 P.2d at 922. Plaintiff did not again object to OII's use of the "Stanfield" trademarks until September 6, 1991, when his counsel wrote a letter to OII.

OII has continuously used the two trademarks in commerce since prior to its applications for registration. In 1983, after five years of continuous use of its "Stanfield" trademarks, OII filed with the Patent and Trademark Office its declarations under sections 8 and 15 of the Lanham Act in order to obtain incontestability status. Between 1974 and 1992, OII expended $429,958.00 on advertising and travel expenses associated with promoting its "Stanfield" trademarks.

Plaintiff has not been involved in any capacity with OII since he resigned in September 1975. He remained unemployed until 1977. Thereafter, he worked at a number of different jobs, including construction work and heavy equipment operation, principally in the States of Washington and Connecticut. He has been unemployed since December 21, 1990, and he now considers himself retired.

Plaintiff has not had any involvement with or interest in any business that might have used the subject trademarks since July 1990. He does not own or control the plant, equipment or other facilities to manufacture products of the type and quality made and sold by OII under the trademarks at issue in this case.

■ In Count I, plaintiff asserts a claim of unfair competition under 15 U.S.C. § 1125(a). Plaintiff essentially argues that the defendants' use of its two registered trademarks that include the word "Stanfield" after July 5, 1990 constitutes an infringement on plaintiff's common law trademark and tradename rights. Trademark or tradename infringement is a type of unfair competition. *See, e.g.*, McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 2.02 (3d ed. 1992). In order to establish liability for unfair competition under § 1125, plaintiff must show (1) he has a protectible trademark, and (2) likelihood of confusion as to the course or origin of defendants' product. *Nike, Inc. v. Just Did It Enterprises*, 799 F.Supp. 894, 896 (N.D.Ill.1992).

■ In Count II, plaintiff alleges that the defendants fraudulently procured registration of OII's two registered trademarks in violation of 15 U.S.C. § 1120. In order to prevail on a fraudulent procurement claim under § 1120, plaintiff must show (1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) intent to induce reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages. *San Juan Products, Inc. v. San Juan Pools of Kansas, Inc.*, 849 F.2d 468, 473 (10th Cir.1988).

■ Both of these claims are premised upon the contention that plaintiff, not OII, is the owner of the "Stanfield" trademark. In the motion for summary judgment, defendants argue that plaintiff's claims must fail because (1) OII's trademarks are incontestable; (2) they are barred by limitations and laches; and (3) plaintiff has sustained no compensable damages. The uncontroverted

facts demonstrate that the first two of these are dispositive, so we will not consider the third.

The defendants have initially suggested that OII's trademarks are incontestable. In support of this contention, they point to their compliance with the trademark requirements of the Lanham Act and argue that (1) plaintiff never used a "Stanfield" trademark in commerce sufficiently to obtain trademark rights therein; (2) the July 1975 agreement was a mere release and could not operate to create trademark rights in plaintiff; (3) to the extent that the July 1975 agreement could be construed as a trademark license, it was a "naked license" that worked as an abandonment of any rights plaintiff had; and (4) even if there remained an issue of fact as to whether plaintiff had any trademark rights, the uncontroverted facts establish that OII did not obtain its trademark registrations or incontestability status "fraudulently."

The third argument raised by the defendants has merit. Even assuming that the plaintiff did have some rights in the "Stanfield" trademark or tradename and that he did enter into a license agreement with OII in July 1975, the court finds that the license agreement was a naked license that worked as an abandonment of any rights plaintiff had.

■ A licensor of a trademark or tradename must exercise control over its use in order to avoid abandonment of the trademark or tradename. *Mini Maid Services v. Maid Brigade Systems,* 967 F.2d 1516, 1519 (11th Cir.1992); *Moore Business Forms, Inc. v. Ryu,* 960 F.2d 486, 489 (5th Cir.1992); *Haymaker Sports, Inc. v. Turian,* 581 F.2d 257, 261 (C.C.P.A.1978). This duty of supervision derives from the Lanham Act's abandonment provisions. *See* 15 U.S.C. § 1064(5)(A). The purpose of the control requirement is to avoid the danger that the public may be misled as to the quality of a product sold under a recognized trademark or tradename. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 387 (5th Cir.1977). As explained in *Dawn Donut Co. v. Hart's Food Stores, Inc.,*

267 F.2d 358, 367 (2d Cir.1959) (citations omitted):

Without the requirement of control, the right of a trademark owner to license his mark separately from the business in connection with which it has been used would create the danger that products bearing the same trademark might be of diverse qualities. If the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark. The public is hardly in a position to uncover deceptive uses of a trademark before they occur and will be at best slow to detect them after they happen. Thus, unless the licensor exercises supervision and control over the operations of its licensees the risk that the public will be unwittingly deceived will be increased and this is precisely what the Act is in part designed to prevent. Clearly the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees.

The courts have reached differing conclusions as to the amount of control and inspection necessary to satisfy the requirement of quality control over trademark licensees. As far as we can determine, the Tenth Circuit has not addressed this question. Most courts have determined that the key issue is whether the licensor has in fact exercised control over the licensee's operations so as to ensure adequate quality. *See General Motors Corp. v. Gibson Chemical & Oil Corp.,* 786 F.2d 105, 110 (2d Cir.1986); *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1017 (9th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *Haymaker Sports,* 581 F.2d at 261; *Turner v. HMH Publishing Co.,* 380 F.2d 224, 229 (5th Cir.1967), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967); *Sterling Drug, Inc. v. Lincoln Laboratories, Inc.,* 322 F.2d 968, 972 (7th Cir.1963). As stated by the Second Circuit in *General Motors:*

The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect his mark is whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark.

786 F.2d at 110.

■ This court agrees with the position taken by these courts. Actual control is necessary to ensure that licensors maintain sufficient quality to prevent consumer deception. It is not necessary, however, for the licenses themselves to contain a written provision for control. As pointed out by the Second Circuit in *Dawn Donut:*

The absence, however, of an express contract right to inspect and supervise a licensee's operations does not mean that the plaintiff's method of licensing failed to comply with the requirements of the Lanham Act. Plaintiff may in fact have exercised control in spite of the absence of any express grant by licensees of the right to inspect and supervise. The question, then, with respect to both plaintiff's contract and non-contract licensees, is whether the plaintiff in fact exercised sufficient control.

267 F.2d at 368.

In an attempt to establish that he did control OII's use of the "Stanfield" trademark or tradename, plaintiff points to the following: (1) his involvement in the development of OII's original production facilities and quality control; (2) his examination of one heating pad since his termination; (3) his lack of knowledge of any quality control problems; and (4) OII's advertisements indicating that the products are good. These contentions, even if true, do not support plaintiff's claim that he controlled the nature and quality of OII's products. The court recognizes that the party asserting an abandonment due to a naked license has a heavy burden. *Kentucky Fried Chicken Corp.,* 549

F.2d at 387. Nevertheless, the undisputed facts before the court indicate that the defendants have met this burden. We find no evidence that the plaintiff exercised any quality control over the products manufactured and distributed by OII.

We begin by examining the license agreement. The agreement grants OII total discretion with respect to the development, design and use of the "Stanfield" mark. The agreement contains no restrictions or controls on OII's use of the mark. Accordingly, the agreement fails to provide any means for plaintiff to ensure the quality of the products manufactured by OII.

The manner in which the agreement was carried out also supports the conclusion that the agreement was a naked license. Plaintiff has conceded that he has not been involved in OII's actual operations since 1975. He left the company in 1975 because he was not satisfied with the way things were going. Since that time, the only "control" that he has exercised has been an occasional discussion with his son concerning OII activities and the inspection of one hog heating pad that his son sent him.[2] This is wholly inadequate to serve as the control required of a trademark licensor. *See First Interstate Bancorp v. Stenquist,* 16 U.S.P.Q.2d 1704, 1990 WL 300321 (N.D.Cal.1990).

■ Plaintiff has also suggested that his reliance upon OII's quality control efforts, coupled with the defendants' representations over the years that the quality of the pad has been maintained, constitutes the necessary control to avoid a naked license. In support of this contention, plaintiff relies upon *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113 (5th Cir.1991), *aff'd on other grounds,* —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Embedded Moments, Inc. v. International Silver Co.,* 648 F.Supp. 187 (E.D.N.Y.1986).

---

**2.** In his deposition, plaintiff plainly stated that after his departure from OII his efforts to monitor or control activities at OII consisted of the examination of one heating pad that had been sent to him by his son. However, in an affidavit he filed in response to the defendants' motion for summary judgment, plaintiff stated that he had inspected pads "from time to time." The statement in the affidavit must be disregarded. *See*

*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 237 (7th Cir.1991). "A party may not create a *genuine* issue of fact contradicting his own earlier statements, at least without a plausible explanation for the sudden change of heart." *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir. 1988) (emphasis in original). Plaintiff has failed to offer any explanation, plausible or otherwise, for this contradictory statement.

In *Taco Cabana* and *Embedded Moments,* the courts did find that a licensor's complete failure to control quality does not mean that the license arrangement is invalid if the licensor reasonably relies upon the licensee's own quality control efforts. However, we do not believe that these cases control for two reasons. First, we are not persuaded by the reasoning of these cases. The criticism expressed by Professor McCarthy in his treatise sums up the court's thinking on this issue:

[M]erely looking to the past results of such "non-control" will not usually serve the goal of quality assurance. Merely because reliance on the licensee's own self-interest has not resulted in a variation of quality in the past does not necessarily mean that such a situation will continue forever. It is difficult to see how the licensor can fulfill its duty to take reasonable steps to control quality merely by totally leaving the matter to the discretion of the licensee.

1 McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18.17[3] (3d ed. 1992).

Second, even assuming we agreed with the reasoning of *Taco Cabana* and *Embedded Moments,* we do not find that the circumstances presented in those cases are present here. In *Taco Cabana* and *Embedded Moments,* special circumstances were present which are absent in this case. For example, in *Taco Cabana,* two brothers owned Taco Cabana restaurants, a chain of Mexican restaurants that had adopted a unique trade dress. The brothers divided the restaurants between themselves, with one brother continuing the "Taco Cabana" name and the other adopting "TaCasita." The division agreement expressly provided that both groups could use the trade dress developed under the "Taco Cabana" name. The defendant Two Pesos opened restaurants that infringed on this trade dress and Taco Cabana sued. Two Pesos argued, *inter alia,* that Taco Cabana had given TaCasita a naked license to use its trade dress and thereby had abandoned its exclusive rights to the trade dress.

The Fifth Circuit rejected Two Pesos' naked license argument because, under the specific facts presented, the close relationship between the two brothers operating Taco Cabana and TaCasita justified relaxation of the normal requirements of control. The court reasoned as follows:

Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities.

.      .      .      .      .

The history of the Stehling brothers' relationship warrants this relaxation of formalities. Prior to the licensing agreement at issue, the Stehling brothers operated Taco Cabana together for approximately eight years. Taco Cabana and TaCasita do not use significantly different procedures or products, and the brothers may be expected to draw on their mutual experience to maintain the requisite quality consistency. They cannot protect their trade dress if they operate their separate restaurants in ignorance of each other's operations, but they need not maintain the careful policing appropriate to more formal license arrangements.

932 F.2d at 1121–22 (citation omitted).

In *Embedded Moments,* plaintiff obtained the rights from several Las Vegas casinos to use their decorative designs in commercial projects that the plaintiff might develop. Plaintiff then entered into a contract with the defendant providing that the defendant would manufacture backgammon sets with these designs for resale by the plaintiff. The agreement also granted defendant a sublicense to utilize the casinos' designs on the backgammon sets. Subsequently, plaintiff sued defendant for breach of the sales and licensing agreements. The defendant argued, *inter alia,* that the license agreement with the plaintiff was void because the original license agreement between the plaintiff and the casinos was void as a naked license. The court was unwilling to grant summary judgment to the defendant based on the naked license argument. The court found no

basis for abandonment even though there was an absence of supervisory control and the license agreement contained no explicit provision for supervisory control. The court found evidence of a prior working relationship between the casinos and plaintiff's president which established a basis for reliance upon the licensee's integrity. The court also found a history of manufacture between the plaintiff and the casinos that was trouble-free. In this regard, the court noted that the plaintiff had previously entered into an agreement with another company to manufacture hats with the casinos' designs. Plaintiff had advised the casinos of this deal by letter and had given the casinos the opportunity to correct any aspect of the hats that they found objectionable. Plaintiff had sent a similar letter to the casinos with respect to the backgammon sets. All of these facts suggested to the district court that sufficient evidence of supervisory control was present.

The facts in this case vary widely from either *Taco Cabana* or *Embedded Moments.* Here, there was no special relationship between the plaintiff and the defendants following his departure from OII in 1975. In fact, plaintiff and the defendants have had an adversarial relationship since 1975. Moreover, plaintiff's suggestion that he relied upon the quality control measures that he established and that were subsequently maintained by the defendants is not supported by the evidence. Plaintiff has plainly indicated that he left OII in part because he was dissatisfied with the way things were going. He further testified that he did not believe that Ronald Thibault knew what he was doing when it came to producing heating pads.

Plaintiff has also suggested, relying upon *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.—East,* 542 F.2d 1053 (9th Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977), that the defendants have resisted or would have resisted any efforts by him concerning quality control. There is no evidence to support this contention. Plaintiff has never attempted to become involved in OII's operations, and thus OII had no reason to resist. Thus, this case is distinguishable from *Edwin K.*

*Williams,* where a licensee actually resisted contractual control by the licensor.

In sum, the July 1975 agreement, if construed as a license agreement, is a textbook example of a naked license. As such, it constituted an abandonment of whatever trademark rights plaintiff might then have held. The abandonment of plaintiff's alleged trademark rights disposes of both his prior use claim and his fraudulent procurement claim.

■■■ One other argument raised by the defendants is also dispositive of plaintiff's first two claims. Defendants contend that plaintiff's claims are barred by laches. We agree. Laches consists of two elements: (1) inexcusable delay in instituting suit; and (2) resulting prejudice to the defendants from such delay. *Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 523 (10th Cir.1987). *Also see Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). The undisputed facts here demonstrate both of these elements.

Plaintiff filed this action in 1992. In 1977, OII applied for its trademark registrations. The marks were subsequently published in 1977, thereby giving plaintiff constructive notice. In 1979 and 1980, during the state court litigation, plaintiff and his attorneys obtained actual knowledge that OII claimed two trademarks using "Stanfield" and that it had registered the trademarks with the United States Patent and Trademark Office in 1977. Following registration, OII expended considerable amounts of money to promote and develop goodwill associated with the marks.

Plaintiff's delay in filing this case clearly constitutes laches. Plaintiff had constructive knowledge of OII's trademarks for over fourteen years prior to filing this lawsuit and actual knowledge for over twelve years. Prejudice has been demonstrated since OII has spent considerable time and expense registering and promoting these trademarks. OII would have saved several hundred thousand dollars if plaintiff had timely pursued his claim of ownership to the "Stanfield" trademark or tradename.

Plaintiff has argued that his claims did not accrue until after July 5, 1990 when the July 1975 agreement ostensibly expired. He asserts that he could not have brought an action prior to that date "because he was not damaged" until then.

The court finds no merit to the plaintiff's contention. The actions taken by OII in registering the "Stanfield" marks are so inherently inconsistent with the plaintiff's licensor rights that plaintiff must act immediately to pursue his claims on his mark. *See Oreck Corp. v. Thomson Consumer Electronics, Inc.,* 796 F.Supp. 1152 (S.D.Ind.1992). He cannot delay until after expiration of the license. He should have timely pursued his claims to the mark upon obtaining actual or constructive knowledge of the licensee's registration.

In conclusion, the court finds that the defendants are entitled to summary judgment on plaintiff's claims brought under the Lanham Act. With judgment entered on these claims, the court shall not exercise supplemental jurisdiction over the remaining claims contained in Count III of the complaint. *See* 28 U.S.C. § 1367(c)(3).

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment (Doc. # 78) be hereby granted. Judgment is hereby granted to the defendants and against the plaintiff on Counts I and II of the complaint. The court shall not exercise supplemental jurisdiction over the remaining claims.

**IT IS SO ORDERED.**