The BRADBURY CO., INC. Plaintiff,

v.

Andre TEISSIER–DUCROS; Georgia P. Bevis; Gean Overseas, Inc.; Gean Overseas/Bossard, Inc.; and ASC Machine Tools, Inc., Defendants.

Andre Teissier–duCros and Gean Overseas, Inc., Counter Plaintiffs,

v.

The Bradbury Co., Inc.; Strilich Technologies, Inc.; American Machine & Rollform Tech, Inc.; Marion Die & Fixture; Hayes International; and Beck Automation; David Bradbury, in his individual capacity; and Chad Bradbury, in his individual capacity, Counter Defendants.

No. 03–1391 WEB.

United States District Court, D. Kansas.

Feb. 7, 2006.

---

See also 413 F.Supp.2d 1203, 2006 WL 266518.

J. Michael Kennalley, Martin & Churchill Chartered, Wichita, KS, for Plaintiff/Counter Defendants.

Andre Teissier–Ducros, Decatur, GA, pro se.

Georgia P. Bevis, Decatur, GA, pro se.

Gean Overseas/Bossard, Inc., Decatur, GA, pro se.

Christian R. Cox, Robert Allen Dunn, Dunn & Black, Spokane, WA, Kenneth G. Gale, Monte A. Vines, Adams & Jones, Chartered, Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

WESLEY E. BROWN, Senior District Judge.

Now before the Court is Defendant ASC Machine Tools, Inc.'s (ASC) motion for summary judgment. (Doc. 215). The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. Plaintiff, Bradbury Company, Inc. (Bradbury) and ASC are competitors in the manufacturing and sales of rollforming equipment. Bradbury has sued ASC for violating the uniform trade secrets act and tortious interference with its non-disclosure contracts with Andre Teissier-duCross (ATC), Georgia P. Beavis (GPB), Gean Overseas Inc (GOI), and Gean Overseas/Bossard Inc (GOB) (collectively the duCross Defendants). Bradbury has requested a permanent injunction and monetary damages.

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims..." Celotex Corp. v. Catrett, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the evidence and all reasonable inferences in favor of Bradbury, the non-moving party. Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1108 (10th Cir.2001). A fact is " 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal–Mart Stores, 144 F.3d 664, 670 (10th Cir.1998). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Id.

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." Id. at 670–671. The movant can do this by demonstrating a lack of evidence on an essential element of the nonmovant's claim. Id. at 671. "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Id. (citing Fed.R.Civ.P. 56(e)).

"To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Adler, 144 F.3d at 671. The nonmoving party cannot defeat a properly supported motion for summary judgment by relying on conclusory allegations; rather the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II. FACTS.

1. ATC describes his relationship with Bradbury as a long term relationship. (Pl. Ex. B–2–b–2 at 368: 17–23); (Pl.Ex. B–5–b–2 at 452: 9–17). ATC is the President of GOI and GOB. (Doc. 106, Def.Ex. A, C). Bradbury entered into an agreement in May of 1994 with GOB. (Doc. 106, Def.Ex. A);(Pl.Ex. B–2–b–1 at 240: 9–19). Under the 1994 Agreement, GOB agreed that the documents which they generated would remain Bradbury's property, and would not be disclosed to third parties or used without Bradbury's permission. (Doc. 106, Def.Ex. A); (Pl.Ex. B–2–b–1 at 242: 21 to 243: 15). GOB agreed to preserve and maintain the confidentiality of all proprie-

tary and confidential information and data acquired from Bradbury or to which they had access. (Doc. 106, Def.Ex. A); (Pl.Ex. B–2–b–1 at 243:4–7).

2. Bradbury entered into another agreement in November of 1999 with GOI. (Doc. 106, Def.Ex. C); (Pl.Ex. B–2–b–1 at 244: 1–7). Under the 1999 Agreement, GOI agreed that it would not disclose Bradbury's identity, strategy, plans, intentions or know-how to third parties. (Doc. 106, Def. Ex. C at 6); (Pl.Ex. B–2–b–1 at 249: 14 to 250: 25). The non-disclosure covenants permanently survived the termination of the agreement. (Id.). Plaintiff did not employ ATC directly; rather it was GOI who was retained by Bradbury. (Pl.Ex. B–1–b–1 at 349: 7–22).

3. Defendant knew ATC was subject to nondisclosure obligations to Bradbury. (Pl.Ex. B–3–a–1 at 31: 3–12, 84: 43–18). Defendant knew ATC had worked for Bradbury and had been privy to Bradbury's confidential information. (Id. at 26:19 to 27: 1); (Id. at 50: 17–20). ATC and GPB had access to Bradbury's confidential information. (Pl.Ex. B–1–b–2 at 441: 10 to 442: 4); (Pl.Ex. B–2–a–1 at 27: 18 to 29: 15); (Pl.Ex. B–2–b–2 at 314: 20 to 315: 5 and 317: 1–21); (Pl.Ex. B–5–a at 99: 11 to 100: 10); (Pl.Ex. B–5–b–2 at 513: 18 to 514: 18); (Pl.Ex. B–2–a–3 at 134:5 to 135: 16); (Pl.Ex. B–2–a–2 at 114: 12 to 118: 10) (Pl.Ex. B–3–a–1 at 84:13–24); (Pl. Ex. B–42); (Pl.Ex. A ¶ 23).

4. ASC and GOI entered into nondisclosure and confidentiality agreements on October 1, 2001 as well as a contract for consulting services on October 17, 2001. (Id. at 86: 11–14); (Def.Ex. A). ASC's contract with GOI included a provision that GOI was not to disclose any information about Bradbury's technologies, products and markets. (Def. Ex. A at 5).

5. Bradbury has proprietary and confidential commercial information relating to its business which derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use. (Pl.Ex. A at 4, ¶ 27). Bradbury has invested time effort and money in developing this information. (Id.).

6. Bradbury's efforts to ensure the secrecy of its information include limiting access to information to select employees, and its requirement that information be kept strictly confidential. (Pl.Ex. A at 4, ¶ 27). Confidentiality agreements were signed by certain employees, including GOI and GOB. (Id.); (Doc. 106, Def.Ex. A, C). Plaintiff takes the following measures to ensure the secrecy of its sales and marketing strategies: disclosure of strategies on a need to know basis; sales force located in one part of the company with file cabinets locked at night; and a book to log employees in and out of the premises. (Pl. Ex. B–1–b–2 at 415: 5 to 416: 6). Plaintiff uses the Maximizer data base to restrict access to customers lists. (Pl.Ex. B–1–b–3 at 557: 22 to 558: 15).

7. In a patent lawsuit commenced on September 20, 2001, ASC sued Bradbury because it suspected Bradbury had unlawfully used its patent to design the QTR, or 514 patent, rollformer. (Comell Aff. ¶¶ 12, 13). In June 2002 Bradbury became aware that ATC had told John Nelson, an ASC attorney, that he had information showing Bradbury's intent to take advantage of court ordered disclosures of ASC's patented roll forming machine. (Pl. Ex. B–1–b–3 at 469: 10–14); (Pl.Ex. B–13 at 2); (Def. Ex. B at 212: 25 to 213: 3, 226: 13–18). ASC used this information against Bradbury in this patent lawsuit. (Def. Ex. B at 215:21 to 216:4). The lawsuit was settled on October 14, 2003 and the case was dismissed. (Def.Ex. C, E).

In the case *sub judice*, Bradbury initially requested $600,000 in damages for the defense of the previously settled patent litigation. (Def. Ex. D at 10). This figure was divided into $400,000 in attorney fees and $200,000 in internal fees for Bradbury's personnel. (Def. Ex. B at 219: 9 to 220: 11, 225: 1–24). Bradbury has renounced its claim for patent litigation attorney fees and revised its damages to an unspecified amount exceeding $100,000. (*Id.* at 278: 4–14); (Mem. of Pl. in Opp'n to Mot. for Summ. J. at 78).

8. ATC knew Bradbury was interested in acquiring a competing company called Metform. (Pl.Ex. B–1–a–1 at 128: 6 to 129: 3); (Pl.Ex. B–2–a–2 at 85:13–19). Bradbury had previously attempted to acquire Metform. (Pl.Ex. B–1–a–1 at 128: 13–18). After GOI began working for ASC, ASC used ATC to pursue Metform as an acquisition target. (*Id.*). ATC made inquiries about Bradbury's confidential information relative to the Metform acquisition, including the purchase price. (*Id.* at 128: 13 to 129: 2). Bradbury did acquire Metform assets. (Pl.Ex. B–2–a–2 at 87: 2–13). Due to ASC's bidding on the Metform acquisition, Bradbury had to pay a higher price to purchase those assets. (Pl. Ex. B–1–a–2 at 169: 22 to 170: 1).

9. Bradbury has new technology. ATC sent a memorandum to ASC warning ASC to watch out for new technologies introduced by Bradbury. (Pl.Ex. B–2–b–1 at 210: 20 to 211: 2).

10. Bradbury has a strategy and method for entering the rollforming market in Australia. (Pl.Ex. B–1–b–2 at 456: 12–19). This strategy included selling products in Australia. (Pl.Ex. B–1–a–2 at 143: 17 to 144: 11); (Pl.Ex. B–2–b–1 at 217:3–20); (Pl.Ex. B–5–a at 188: 14 to 189: 12). Bradbury entered the Australian market more than ten years ago. (Pl.Ex. B–1–a–2 at 145: 23 to 146: 2). Once a company is in the market, competitors will become aware that the company is pursuing sales. (Pl.Ex. B–1–a–1 at 91: 23 to 92: 1).

11. Bradbury's China strategy includes: pursuit of strategic alliances, the plan to enter the Chinese market, the efforts to manufacture in China, and the people used in China to implement this strategy. (B–1–a–2 at 151: 5–12); (Pl.Ex. B–2–b–1 at 217: 3–20); (Pl.Ex. B–6 at 182: 12–17). Bowen Lo was Bradbury's employee in China from 1995 to 2000. (Pl.Ex. B–1–b–3 at 490: 11 to 491:6). Plaintiff states it was a secret that it was looking at China. (Pl.Ex. B–1–a–2 at 151: 5 to 152: 10). ATC was aware of Bradbury's China strategy. (*Id.*). Bradbury noticed ASC's entry into the China market in 2002. (*Id.* at 135: 13–16).

12. Bradbury's strategy to expand into Europe included the future sales of rollforming, coil processing, leveler equipment, FMS systems, shelving and racking, and HVAC products. (Pl.Ex. B–1–a–1 at 95: 14 –23, 97: 12–18).[1] Bradbury made contacts with several European companies in pursuit of this strategy. (Pl.Ex. B–2–a–1 at 40: 7–21); (Pl.Ex. B–2–a–3 at 152: 18 to 153: 25). Bradbury states that the countries and industries into which they wanted to expand was confidential. (Pl. Ex. B–1–a–1 at 94: 7–20, 96: 21 to 97: 4).

13. Bradbury investigated and had a strategy to enter the insulated panel market. The investigation into this market included the identities and locations of companies in the market, identities of companies for potential joint venture partners, the market's use of steel, customer surveys and a comparison of European and American markets. (Pl.Ex. B–1–a–2 at 167: 12–

---

1. The facts show Bradbury also wanted to get into the insulated panel market in Europe; however, Plaintiff has addressed their strategy to enter the insulated panel separately. The Court will do the same.

19); (Pl.Ex. B–1–b–2 at 429: 25 to 430: 6, 431: 2–13); (Pl.Ex. B–5–b–1 at 309: 1–15)(Pl. Ex. B–1–a–1 at 119: 20 to 121: 5); (Pl.Ex. B–2–a–3 at 174:2 to 175: 13): (Pl. Ex. B–2–b–1 at 219:22 to 220:20). There is no fact showing that the companies designated as potential partners for a joint venture were under confidentiality agreements. (Pl.Ex. B–1–b–2 at 433: 24 to 434: 5). Companies involved in the insulated panel market are public knowledge and readily ascertainable. (Pl.Ex. B–5–b–1 at 309: 5–15).

Bradbury's strategy was to enter the lucrative insulated panel market, which it did sometime in 2001. (*Id.* at 301: 8 to 302: 14); (Pl.Ex. B–1–b–2 at 430: 7–12). Bradbury's intention to enter the insulated panel market was not generally known. (Pl.Ex. B–5–b–1 at 305:7–10, 306:11–18); (Pl.Ex. B–1–b–2 at 432: 17–25). Once Bradbury entered into the insulated panel market, its strategy was no longer a secret. (Pl.Ex. B–5–b–1 at 307: 6–11).

On December 28, 2001, ATC sent a letter to Siempelkemp and Dreistern Werk to solicit appointments to meet with them on behalf of ASC. (*Id.* at 151: 21 to 153: 25). ATC had communicated with these companies when he worked with Bradbury. (*Id.*). These two letters request a meeting about a possible partnership; however, they state nothing about the insulated panel market. (Pl.Ex. B–31); (Pl.Ex. B–32). Siempelkemp is a leader in the insulated panel industry. (Pl.Ex. B–2–a–1 at 49: 23 to 50: 12).

An email dated May 23, 2002 shows ATC contacted Cannon company about insulated panels. (Pl.Ex. B–2–a–3 at 179:3–20). An e mail dated May 28, 2002 shows ATC contacted Arcelor construction to discuss ASC and insulated panels. (*Id.* at 178: 14–19). In a workshop for ASC on August 29, 2002, ATC identified the insulated panel market as a strategic opportunity. (*Id.* at 194: 18–23). In 2002, ATC performed market research and recommended that ASC enter into the insulated panel market. (Pl.Ex. B–1–a–1 at 37: 5 to 38: 25). A June 1, 2003 e mail shows ATC wanted to position ASC as a credible supplier of insulated panels. (Pl.Ex. B–2–b–3 at 376: 3–15). In September 25, 2003 e mail, ATC wrote to ASC that its efforts would open up a market in the insulated panel industry. (*Id.* at 392: 4–18). In 2002 or 2003, ATC performed a study for ASC regarding the insulated panel market, including, the volume, growth, manufacturers and other figures. (*Id.* at 430: 9 to 431: 12). On June 17, 2003 ATC presented information about a study on the insulated panel market. (Pl.Ex. B–3–b–1 at 242: 7–25). On June 19, 2003, ATC called the Cannon company about a possible joint venture project in the insulated panel business. (Pl.Ex. B–2–b–2 at 348: 22 to 349: 8).

14. Bradbury has a strategy to market and sell entry level equipment to create captive customers who will later purchase upgrades. (Pl.Ex. B–1–b–2 at 419: 22 to 420 to 7); (Pl.Ex. B–1–a–2 at 141: 1–12, 171: 17 to 173: 6). This strategy included the acquisition of Hayes because Hayes manufactured and sold entry level equipment. (Pl.Ex. B–1–b–2 at 406: 14–17). Bradbury acquired Hayes in the summer of 1999. (*Id.* at 405: 16–17). Bradbury's acquisition of Hayes to sell entry level equipment in the United States was not a secret. (Pl.Ex. B–5–a at 229: 5 to 230: 10). By selling entry level equipment, the industry would discovery that Bradbury sells entry level equipment, can service it and can sell upgrades. (Pl.Ex. B–1–b–2 at 418: 3–10). Bradbury made its first sale through the Hayes company in December 1999. (*Id.* at 416: 11–13). Other companies employ this same strategy. (*Id.* at 418: 20–25).

15. Bradbury has high level contacts in the roll forming industry and commercial relationships with Metsec, Siempelkamp and Metechno and information about past and future orders to Metsec. Bradbury has contact names for these companies and describes them as high level. (Pl.Ex. B–1–a–2 at 181: 23 to 182: 23, 184: 2–9). At times, Plaintiff views prospects, leads and existing customers as confidential. (Pl.Ex. B–1–b–3 at 557: 25 to 558: 5). ATC knew these high level contacts and information about Bradbury's past and future orders with Metsec. (Pl.Ex. B–2–a–2 at 82: 1–12). ATC told ASC that he had previous contact with Metsec while working for Bradbury. (Pl.Ex. B–2–a–3 at 190: 23 to 192: 4).

16. Bradbury has a strategy and methodology to form a relationship with Cavalier Homes and pursued concepts with Cavalier. Bradbury was pursuing a concept to convert their manufactured housing from wood to steel. (Pl.Ex. B–1–b–3 at 479: 21 to 480: 10). Bradbury kept a prototype illustrating this strategy in a confidential place. (Pl.Ex. B–1–a–2 at 192: 5–8). Bradbury's pursuit of Cavalier as a customer and the strategy to sell this idea were not known to the industry. (Pl.Ex. B–1–b–3 at 479: 21 to 480: 10). ATC knew of Cavalier and this concept. (Pl.Ex. B–2–b–1 at 215: 6–24). Cavalier homes was under no obligation to keep this strategy secret. (Pl.Ex. B–1–b–3 at 480: 13–18). In 2002, ATC visited Cavalier and listed it as an area of opportunity for ASC to explore. (Pl.Ex. B–2–a–3 at 194: 18 to 195: 2); (Pl.Ex. B–2–a–3 at 183: 13 to 184: 15); (Pl.Ex. B–3–a–2 at 126: 21 to 127: 5). During this visit, ATC, ASC and Cavalier talked about steel framing for modular housing. (Pl.Ex. B–1–a–2 at 195:1 to 196: 1).

17. Bradbury has information about the identities of certain employees, their roles, their strengths and weaknesses and information they possess. (Pl.Ex. B–1–b–3 at 484: 6–24); (Pl.Ex. B–1–a–2 and B–1–a–3 at 199: 15 to 201: 11, 202:5–10, 205: 16–19). Many of these employees were sales agents who were known in the industry to be Bradbury's employees. (Pl.Ex. B–1–b–3 at 492: 5–17, 486: 8 to 488: 25).

18. Bradbury has confidential sales tactics and methods including the "banana skin" bidding technique. Bradbury describes its sales techniques as the knowledge relating to an each of its sales individual's strengths and weaknesses, track records, how they sell and for what projects they are best suited. (Pl.Ex. B–1–b–3 at 499: 4 to 500: 4). Some of an individual's sales techniques are public knowledge. (*Id.* at 498: 10–14).

Bradbury's "banana skin" bidding technique involves giving two bids, the one the customer wants and the second is what you think the customer needs; furthermore, one of these will be the low price which will catch a competitor off guard. (Pl.Ex. B–2–a–1 at 24: 10 to 25: 6). This sales technique always offered the minimum price no matter what the customer asks. (Pl.Ex. B–7 at 141: 16–25). ATC learned this technique in Germany a long time ago. (Pl.Ex. B–2–a–1 at 25: 4–6). Bradbury's sales force used this technique to submit bids to customers after 1997 when it was implemented by Bradbury. (Pl.Ex. B–7 at 149: 22 to 152: 2). No secrecy agreements were signed with customers when using the banana skin bidding technique. (*Id.* at 152: 3–8). The banana skin technique was no longer a secret once it was used on customers. (*Id.* at 152: 9–23).

19. Bradbury had confidential information about the profitability, strategy and research of the garage door market, as well as the identity of garage door manufacturers.

On a monthly basis, ATC was exposed to Bradbury's financial information and the performance of projects in the garage door market. (Pl.Ex. B–1–b–2 at 441: 10 to 442: 4). This information was passed during meetings. (*Id.*). The garage door line was Bradbury's most profitable market and while it varied from year to year, it earned consistently greater than 20 percent gross margin. (*Id.* at 443: 8–24). Bradbury calculated profit based on the price of the sale minus the cost of building the product. (*Id.*). The profitability of their orders in the garage door market is secret and not generally known. (Pl.Ex. B–5–a at 241: 4–12). While working for Bradbury, ATC performed market research which included strategic scenarios to establish market dominance. (Pl.Ex. B–2–b–1 at 278: 10–13); (Pl.Ex. B–2–b–2 at 317: 1–8). ATC also identified garage door companies in the market. (Pl.Ex. B–2–b–1 at 279: 21 to 280: 9). After ATC began working for ASC, ASC began to sell integrated garage door lines. (Pl.Ex. B–1–b–2 at 450: 7 to 451: 2).

20. Bradbury possessed the 12 Rules of Market Dominance as applied to the rollforming industry. (Pl.Ex. B–1–a–1 at 117:10 to 118:20). The evidence shows that ATC and Bradbury took twelve generic rules of marketing and specifically applied them to the rollforming market. (*Id.*). The generic 12 Rules of Market Dominance are not confidential. (*Id.*). The 12 Rules of Market Dominance as applied to the rollforming industry included information about Bradbury's market position, equipment lines, and strategic philosophies on customer service. (Pl.Ex. B–10 at 40: 15–20). The 12 Rules of Market Dominance as they apply to the rollforming equipment were confidential and not generally known. (*Id.* at 38: 3 to 40: 20).

ATC told ASC that the 12 Rules of Market Dominance were universal business principles that could be applied to anything. (*Id.* at 213: 14–21). ATC also stated that these 12 Rules of Market Dominance would be appropriate for ASC's business. (*Id.* at 252: 12–18). ASC is in the same business as Bradbury. (Comell Aff. at 2 ¶ 2). ASC disclosed the 12 Rules of Market Dominance to ASC's employees. (Pl.Ex. B–2–a–2 at 109: 2–15); (Pl.Ex. B–8 at 97: 12–16).

21. Bradbury has client information listing companies using uncoilers, classified by capacity and weight of the uncoiler. (Pl.Ex. B–2–a–3 at 134: 17 to 136:5). This list was created in part by ATC's students from Georgia Tech. (Pl.Ex. B–2–a–3 at 134: 17 to 136:5).

22. Bradbury has market and competition research results. In 2003, ATC performed market and competition research for ASC. (Pl.Ex. B–2–b–3 at 384: 3 to 385: 1).

23. Bradbury has confidential knowledge of the relative positions of Bradbury and ASC to compete with one another. (Pl.Ex. B–2–a–2 at 122: 14 to 124: 8). Each company was aware of each other's abilities to compete due to two attempted acquisition deals where each had exchanged confidential information. (*Id.* at 123: 16 to 124: 8).

24. Bradbury has competitive assessments between Bradbury and ASC. A competitive assessment is a method ATC developed in Europe in the 1970s which measures how competitive a firm is compared to other firms in the industry. (Pl. Ex. B–2–a–1 at 20: 9–20). ATC performed a competitive assessment for Bradbury. (*Id.* at 21: 20 to 22: 6); (Pl.Ex. B–2–b–1 at 280: 16–22). ATC performed a competitive assessment for ASC. (Pl.Ex. B–2–b–3 at 1–10). Some of the competitive assessments for Bradbury were done by ATC's students at Georgia Tech. (Pl. Ex. B–2–a–1 at 21: 1–19).

25. GOI did market and competition intelligence, market share forecasts and market assessments for Bradbury. (Pl. Ex. B–2–b–1 at 265: 15–23, 266: 3–16, 277: 21 to 16); (Pl.Ex. B–2–a–1 at 26: 1–5). The market share forecast includes what Bradbury knows of the total market, including a competitor's market share and strengths. (Pl.Ex. B–2–b–3 at 402: 2–13). When GOI worked for ASC, ATC performed a market assessment and sales forecast. (Pl.Ex. B–3–b–1 at 270: 22 to 271: 6).

26. Bradbury has confidential information regarding the possible divestiture of assets of Strilich Technologies, Inc. (STI), and Bradbury's valuation of STI's engineering. Information about the valuation of the engineering assets and that Bradbury no longer owned STI was not generally known and was confidential. (Pl.Ex. B–1–b–3 at 503: 5–23). Towards the end of 2001, ATC inquired of STI about the sale of intellectual property. (Pl.Ex. B–1–a–3 at 269:21 to 270: 25); (Pl.Ex. B–2–a–2 at 79: 6 to 80: 9); (Pl.Ex. B–45).

## III. ALLEGATIONS ADDRESSED BY SETTLEMENT AGREEMENT

ASC argues that three of Bradbury's allegations of trade secret misappropriation and interference with non-disclosure contracts are barred by an October 14, 2003 contract to settle patent litigation. Bradbury supports these allegations with facts from number seven. The three allegations at issue are:

rr) Commercial information concerning the patent lawsuit between ASC and Bradbury, including meeting notes and diary entries of [ATC].

ss) Commercial information concerning Bradbury's activities with respect to ASC's drawings.

tt) Commercial information concerning Bradbury's activities with respect to ASC's patents.

(Def. Ex. C at 4).

To determine whether these allegations are barred by the provisions of the settlement agreement, the Court will have to interpret the agreement.[2] The relevant portion of the patent litigation settlement agreement states:

The Parties desire to avoid future litigation insofar as is reasonably possible . . .

. . .

The Parties warrant and represent, each to the other, that they have, either personally or through their attorney or attorneys, fully investigated, to such Parties' full satisfaction, all facts surrounding the various claims, controversies and disputes and are fully satisfied with the terms and effects of this Agreement.

. . .

Bradbury hereby warrants, promises and forever covenants not to sue or otherwise assert any claims or causes of action against ASC for damages, attorney fees, expenses, costs, injunctions, or any other obligations of any kind whatsoever arising under, out of, or in connection with the '514 patent . . . to the extent that ASC makes, uses, sells, or offers to sell purlin roll formers that have forming rolls with an hourglass shape in overform passes, whether in law or in equity, in contract or in tort, or under any federal, state, or local law

. . .

However, both parties have argued for an interpretation of the agreement in the current motion.

2. The parties agreed in the settlement agreement that an action to interpret the Agreement shall be brought in the U.S. District Court in the Eastern District of Washington.

(a) ASC and its respective subsidiaries, all present and former directors, officers, agents, representatives and employees in their capacity with ASC...

...

(c) **Court Costs and Attorney Fees.** Each Party agrees to bear its own costs of suit with respect to the First and Second Lawsuits, including specifically any attorney fees expended.

...

(g) **Law Governing.** The validity, construction, interpretation and administration of this Agreement shall be governed by the laws of the State of Washington, except that any conflicts of law rule requiring reference to another jurisdiction, except federal law, shall be disregarded...

(Def. Ex. C at 2, 3, 5, 8).

■ The language of the agreement shows the parties intended that Washington law govern the terms of the settlement agreement. Each party argues for an interpretation of the agreement that supports their position; however, neither party cites any law. The Court will use Washington law to interpret the settlement agreement as this is what is expressed in the contract and Kansas generally gives effect to such contractual choice of law provisions. *See Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 375, 273 Kan. 525 (2002); *see BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir.1999) (a federal court sitting in diversity applies the choice of law rules of the forum state).

■ The interpretation of a written contract is a question of law for the court. *Stewart v. Chevron Chem. Co.* 762 P.2d 1143, 1145, 111 Wash.2d 609, 613 (1988). Washington follows the objective manifestation theory of contracts. *Hearst Communs., Inc. v. Seattle Times Co.*, 115 P.3d 262, 267, 154 Wash.2d 493, 503–504 (2005). Under this theory, "we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties. We impute an intention corresponding to the reasonable meaning of the words used." *Id.*

■ Bradbury argues that only patent claims were settled by the settlement agreement; however, the language in the settlement agreement is clearly broad enough to encompass other claims. Bradbury warranted not to assert *"any claims... of any kind whatsoever* arising under, out of, or in connection with the '514 patent..."* (Def. Ex. C at 5) (emphasis added). This provision applies to "any claims" and not just patent claims as advocated by Bradbury. Bradbury's narrow interpretation is at odds with the language in the agreement. The contractual provision also makes clear that only claims arising under, out of, or in connection with the '514 patent are barred. The facts provided by Bradbury show that Bradbury's trade secret and tortious interference with the non-disclosure claims arise under, out of, or in connection with the '514 patent.

In his affidavit, Nelson stated: "I spoke with Dr. Teissier-duCros by telephone on Monday, May 6, 2002, and he indicated that he believes he has personal knowledge of facts relevant to ASC's claim..." (Pl. Ex. B–13 at 2). David Cox, Bradbury's Rule 30(b)(6) representative, stated, "[ATC] disclosed his notes and memoranda to ASC's attorney, John R. Nelson, during the patent litigation and alleged that we had done certain things that would violate ASC's patent." (Pl.Ex. B–1–b–3 at 469: 10–14). These statements show that the purpose of ATC's conversation with Nelson was to succor ASC's patent claim, which alleged Bradbury's misuse of ASC's patent to develop the QTR, or 514 patent, rollformer.

Moreover, Bradbury's new damage figure is related to the patent litigation because Bradbury has only dropped the claim for patent litigation attorney fees. Bradbury did not state that it will not continue to pursue damages for internal fees and costs due to the patent litigation. Moreover, Bradbury has continued to insist that ATC's statement to Nelson caused damage to Bradbury during the patent litigation. (Mem. of Pl. in Opp'n to Mot. for Summ. J. at 7–8).

The Court holds that Plaintiff's three allegations based on the facts in number seven arise in connection with the 514 patent. The Court further notes that a decision otherwise would undermine the intent of the parties as stated in other provisions of the settlement agreement.

First, Bradbury's damages for internal costs relate to its personnel that spent time working on the patent litigation. This is covered by the settlement agreement's provision that each party will bear its own costs. Second, Bradbury knew in June 2002 that ATC had allegedly disclosed protected information about Bradbury's 514 patent. Bradbury warranted in the settlement agreement that it had investigated all the facts, claims, controversies and disputes and is satisfied with the agreement. To allow Bradbury to base its claims on these facts would undermine the finality of the agreement as it reopens issues resolved in the patent settlement. The Court holds that the interference with contract and misappropriation claims based on ATC's alleged disclosure of information to ASC has been released by the settlement agreement.[3]

## IV. MISAPPROPRIATION OF TRADE SECRETS

ASC argues it is entitled to summary judgment on Bradbury's claims for misappropriation of trade secrets because Bradbury has failed to identify any trade secrets or show ASC misappropriated them. Specifically, ASC argues that Bradbury has not described the subject matter of the trade secrets in detail; that the alleged trade secrets were known or readily ascertainable; and that Bradbury did not make reasonable efforts to maintain secrecy.

The Kansas Uniform Trade Secrets Act (KUTSA) defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Kan. Stat. Ann. § 60–3320(4).

■ The existence of a trade secret is a question for the trier of fact; however, the plaintiff must produce some evidence showing that the information alleged to be a trade secret meets the definition of a

---

**3.** The Court has interpreted the settlement agreement's covenant not to sue as a release. *See Maguire v. Teuber*, 85 P.3d 939, 942, 120 Wash.App. 393, 397–398 (2004) (word release in a settlement agreement not necessary for it to operate as a release). This will avoid unnecessary litigation as a release is available as an affirmative defense whereas a covenant not to sue is an enforceable contractual right. *Haney v. Cheatham*, 8 Wash.2d 310, 316, 111 P.2d 1003 (1941). Addressing this issue now negates the need to bring a subsequent suit for a breach of the covenant not to sue. Moreover, this interpretation conforms to the parties' express desire in the settlement agreement to avoid future litigation. *See Mills v. Inter Island Tel. Co.*, 68 Wash.2d 820, 829, 416 P.2d 115, 121 (1966) (the distinction between a covenant not to sue and a release will be preserved according to the intention of the parties).

trade secret. ·*Dodson Intern. Parts, Inc. v. Altendorf,* 347 F.Supp.2d 997, 1010 (D.Kan.2004). This burden is not met by general allegations; rather, it must be met by describing "the subject matter of their trade secrets in sufficient detail to establish each element of a trade secret." *Id.* Plaintiff has the burden under the KUTSA to define its trade secrets with the precision and particularity necessary to separate it from the general skill and knowledge possessed by others. *BioCore, Inc. v. Khosrowshahi,* 96 F.Supp.2d 1221, 1231 (D.Kan.2000).

> Customer lists containing merely public information that could be easily compiled by third parties will not be protected as trade secrets; however, where the party compiling the customer lists, while using public information as a source,...expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection.

*Id.* at 1011 (internal citations and quotations omitted).

 "Kansas law does not require the holder of a trade secret to maintain its complete secrecy; rather Kansas law requires merely that the holder of a trade secret exercise reasonable efforts under the circumstances to maintain its secrecy." *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.,* 107 F.Supp.2d 1307, 1310 (D.Kan.2000).

"Even if the plaintiff establishes the existence of a valuable trade secret which has been subject to reasonable efforts to maintain secrecy, the plaintiff must establish that there has been a misappropriation of the trade secret by the defendant." *Id.* at 1011 (internal citations omitted). The

KUTSA defines misappropriation as follows:

> (2) "Misappropriation" means:
>
> (i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (ii) disclosure or use of a trade secret of another without express or implied consent by a person who
>
> (A) used improper means to acquire knowledge of the trade secret; or
>
> (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
>
> (I) derived from or through a person who had utilized improper means to acquire it;
>
> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Kan. Stat. Ann. § 60–3320(2).

"Improper means includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 60–3320(1) (internal quotations omitted). Cases from other jurisdictions are persuasive as the KUTSA states, "this act shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this act among states enacting it".[4] *Id.* § 60–3327.

---

4. The Tenth Circuit interprets state laws according to state rules of statutory construction. *Ward v. Utah,* 398 F.3d 1239, 1248

(10th Cir.2005). The Kansas Supreme Court has explained that it "is a fundamental rule of statutory construction, to which all other

The Court will analyze each claim on an individual basis. In fact five, Bradbury provides a sweeping statement from an affidavit which is supposed to show that all its individual trade secrets in facts eight through twenty-six were not known or readily ascertainable by the industry. This does not suffice. A party cannot withstand summary judgment by making general and conclusory statements. *Crane Constr. Co. v. Klaus Masonry*, 71 F.Supp.2d 1125, 1128 (D.Kan.1999). In fact, most of Bradbury's statement is a simple recitation of the statutory language. See Kan. Stat. Ann. § 60–3320(4)(i). Due to the fact specific nature of a trade secret inquiry and the variety of Plaintiff's trade secrets, this general statement is quite inadequate to show that all its varied trade secrets are not known or readily ascertainable.

A. Using the facts under number eight, Bradbury alleges its plan to acquire Metform is a trade secret. Bradbury does not provide sufficient facts to support such a claim. Bradbury provides no facts showing that Bradbury's desire to acquire and the eventual acquisition of Metform were not readily ascertainable to the industry. In fact, the only information cited as confidential is Bradbury's pricing information relative to the acquisition, which ATC did not know but attempted to discover. Because Plaintiff has not satisfied its burden, summary judgment is granted on this allegation.

B. Using the facts in number nine, Bradbury's argues that its unspecified "new technology" is a trade secret. Bradbury provides no details about this new technology or how it meets the elements of a trade secret. The Court cannot grant trade secret status to unsupported conclusory statements. *Crane*, 71

F.Supp.2d at 1128. Plaintiff has failed to meet its burden to provide sufficient facts; therefore, summary judgment on this allegation is granted.

C. Using the facts under number ten, Bradbury attempts to convince the Court that its Australian strategy is a trade secret. The Court is not convinced. First, the facts show that the strategy consisted of nothing more than a plan to sell products in Australia. There are no other specific details provided. Second, there is no allegation that this strategy was not known or readily ascertainable by the industry. The facts show Bradbury had been in the Australian market for over ten years and it was known to competitors. Bradbury's Australian strategy is not a trade secret and summary judgment is granted.

D. Bradbury uses the facts in number eleven to argue that its China strategy is a trade secret. This allegation fails for two reasons. First, Bradbury fails to provide sufficient details about its strategy. Plaintiff claims that it was talking to specific Chinese companies; however, Plaintiff fails to tell the Court anything about the companies including the names, locations, descriptions, documents, e-mails or telephone conversations. A generic statement that all negotiations or talks with all companies in China is too broad to be a trade secret. Bradbury's allegation about employees is also too general. With the exception of Bowen Lo, Bradbury fails to identify any other person working on the secret China strategy.

Second, Bradbury fails to allege facts showing that its strategy in China was not readily ascertainable. Specifically, Bowen Lo worked for Bradbury in China for five

rules are subordinate, that the intent of the legislature governs if that intent can be ascertained." *United States v. Riccardi*, 258

F.Supp.2d 1212, 1221 (D.Kan.2003) (*quoting State ex rel. Stovall v. Meneley*, 22 P.3d 124, 143, 271 Kan. 355, 378 (2001)).

years but Bradbury provides no facts to show how Mr. Lo or the identities of Bradbury's other employees were not readily ascertainable by the industry. Similarly, there is no fact showing that the Chinese companies with whom Bradbury spoke were under any obligation to keep Bradbury's interest in China secret. Bradbury only states that it did not advertise to the whole world that it was looking at China; however, Bradbury fails to provide any evidence that its personnel in China, talks with Chinese companies and as a corollary, its interest and plan to enter China were not at least readily ascertainable by the industry. For these two reasons, summary judgment is granted on this claim.

E. Bradbury uses the facts in number twelve to argue that its European strategy was a trade secret. This allegation does not pass muster on summary judgment because there is a lack of detail and there is no allegation that Bradbury's intentions were not generally known or readily ascertainable.

First, Bradbury states that the new industries and countries into which it wanted to expand were confidential; however, Bradbury does not reveal these specific countries. There are no facts to show anything but a general desire to sell products in unnamed European countries. While Bradbury identifies certain industries into which it wanted to expand, it again fails to provide sufficient details. The deposition testimony shows Bradbury wanted to diversify into new industries, "i.e., insulated panels, more into FMS type systems, shelving and racking, HVAC product lines, things of that nature." (Pl. Ex. B–1–a–1 at 97: 12–18). This lone supporting statement is not sufficient as it is shows nothing more than a possibility of selling different equipment. Bradbury cites no other supporting facts explaining what these products/industries are, if Bradbury indeed entered those new indus-

tries and markets, market research or analysis, cost analysis, bids, quotes, or proposals. There is nothing to support Bradbury's desire to enter new industries other than this one statement. This is not enough to be a trade secret or withstand summary judgment.

Second, the facts show Bradbury spoke to different European companies but it fails to allege that any of these companies were obligated to keep Bradbury's interest in Europe a secret. Bradbury fails to provide facts that show that its strategy to sell products in Europe was not readily ascertainable. For these reasons, summary judgment on this allegation is granted.

 F. Bradbury uses the facts in number thirteen to argue that its investigation and strategy to enter the insulated panel market are trade secrets which ASC misappropriated. The facts show that companies involved in the insulated panel market were not secret and Bradbury provides no evidence that any of the other things that make up the investigation, such as the market's use of steel and customer surveys, were not generally known or readily ascertainable. However, Bradbury's strategy to enter the insulated panel marketplace was not generally known before 2001, because it had not yet entered the market.

However, Bradbury provides no facts to show ASC misappropriated this strategy before 2002. Bradbury provides much evidence showing that ATC helped ASC explore the lucrative insulated panel market and ASC's pursue companies as partners in the insulated panel industry; however, all of this evidence is after 2001. The earliest evidence showing ASC's inclination to enter into the insulated panel market is sometime in 2002. Because Bradbury's secret strategy to enter the insulated panel market lost its secret status once it

actually entered the market in 2001, facts showing ATC's and ASC's involvement in this industry after this date are not misappropriation.

The letters sent on 12/28/2001 from ATC to Siempelkemp and Dreistem Werk are insufficient to show misappropriation. These letters were sent to solicit interest in a possible partnership; however, the insulated panel industry is not mentioned either of these letters. (Pl.Ex. B–32); (Pl. Ex. B–31). Siempelkemp is a leader in the insulated panel industry; however, it would be speculation to assume that this shows misappropriation, especially because insulated panels are not mentioned in the letter. *See BioCore,* 96 F.Supp.2d at 1229–1230 (plaintiff must off more than vague assertions that defendant could not help but use trade secret information). Consequently, summary judgment is granted for this allegation.

■ G. Bradbury uses the facts in number fourteen to argue that its strategy to market and sell entry level equipment to create captive customers was a trade secret. The Court disagrees. While Bradbury attempted to keep its strategy secret, the facts show that this strategy was already known or at the very least readily ascertainable by the industry. Plaintiff has not met its burden to show how this strategy differs from matters of general knowledge in the industry; hence, summary judgment on Plaintiff's claim insofar as it is based on this allegation is granted. *See Id.* at 1231 (plaintiff has burden to show how their secret differs from matters of general knowledge in the trade).

■ H. Using the facts in number fifteen, Bradbury argues that its high level contacts, commercial relationships and Metsec's ordering information are trade secrets. The Court disagrees. First, labeling a contact as "high level" with the general statement that sometimes they are

confidential is not sufficient to merit trade secret protection. Bradbury provides no facts to show that its contacts and relationships were not known or readily ascertainable by those in the industry. *See Fox Sports Net N. v. Minn. Twins P'ship,* 319 F.3d 329, 336 (8th Cir.2003) (knowledge of industry contact people does not rise to the level of a trade secret because this type of unprotected information is readily ascertainable within a trade). Second, Bradbury's past and future orders about Metsec are not trade secrets because Plaintiff has not provided any other evidence other than to state the existence of such orders. Due to the lack of evidence to support trade secret status of this allegation, summary judgment is granted.

■ I. Using facts in number sixteen, Plaintiff argues that its intent to explore a confidential concept with Cavalier and other customers was a trade secret. Plaintiff has provided specific facts showing ATC knew of this confidential concept and Cavalier's status as a prospective customer of Bradbury's. After ATC began working for ASC, ASC began to explore the same concept with Cavalier.

ASC argues there is no evidence of misappropriation because it never sold anything or submitted a quote to Cavalier. However, ASC does not deny meeting with Cavalier about the same concept. ASC argues there is no direct evidence that shows misappropriation; however, the standard on summary judgment does not limit the nonmovant to direct evidence. *See Greenberg v. Croydon Plastics Co.,* 378 F.Supp. 806, 814 (E.D.Pa.1974) (direct evidence of trade secret misappropriation is rarely available). Bradbury provides circumstantial evidence of a disclosure and this is sufficient to avoid summary judgment.

However, Bradbury's remaining claims for the misappropriation of other custom-

ers must fail on summary judgment because Bradbury provides no facts. (Pl.Ex. A ¶ 15). Bradbury does not even identify these alleged customers. (B–1–a–2 at 199: 10–14). A trade secret claim based on this most general statement cannot be maintained and summary judgment is appropriate.

 J. Bradbury uses fact seventeen as support that the identities, roles, strengths, weaknesses and information possessed by/of its employees are trade secrets. The Court disagrees.

First, Bradbury provides no facts showing how identities, roles, strengths and weaknesses were kept secret or were not readily ascertainable by anyone who interacted with them. Moreover, the facts show that many of these employees were known in the industry to be Bradbury's employees.

Second, a person's strengths and weaknesses are not company trade secrets but rather subjective general skills belonging to the employee. *See Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv., Inc.,* 807 F.2d 1256, 1263 (5th Cir.1987) (the employee, upon terminating his employment relationship with his employer, is entitled to take with him the experience, memory, and skill which he gained while employed); *see Metro Traffic Control v. Shadow Traffic Network,* 22 Cal.App.4th 853, 862, 27 Cal.Rptr.2d 573 (2d Dist.1994) (Radio announcers' quality, sound and personality are subjective dimensions, not intangible property owned by the employer).

Finally, information possessed by these employees is not a trade secret because Bradbury does not provide the Court with any facts to describe what confidential information these individuals possessed. Bradbury has not met its burden to produce sufficient evidence; consequently, summary judgment is appropriate for this allegation.

 K. Bradbury uses fact eighteen as support for its allegation that its sales tactics and methods including the banana skin bidding technique are trade secrets. The facts do not support this conclusion. First, Bradbury's use of the banana skin sales method necessarily discloses its existence to the customer and makes it readily ascertainable to those in the industry that Bradbury is submitting a high and low bid.

Second, the unspecified sales techniques of each sales member will also be ascertainable by customers. Indeed, Plaintiff admitted as much in its deposition.

"Would you agree with the statement that the whole world knows Chad Bradbury's sales tactics if they've had any involvement with him in the sales arena?" "Certainly not all his tactics, no." (*Id.* at 498: 10–14).

This shows that at least some of these "secret" sales tactics are public knowledge.[5] Bradbury fails to give any details about which tactics are secret and which are disclosed to the public. Plaintiff does not produce a list or other record establishing the identity of their sales force, their individual strengths, weaknesses, their tactics, track record, and the type of projects for which individuals would be suited. All that is produced is a vague deposition statement that all these things for all sales members are trade secrets.

Furthermore, these amorphous secrets are subjective. An appraisal of an individual's work strengths, how they sell, and the type of projects for which they are best suited can differ depending on the individual doing the evaluating. *See Metro Traffic,* 22 Cal.App.4th at 862, 27 Cal. Rptr.2d 573 (Radio announcers' quality,

---

**5.** Indeed, this Court cannot imagine an effective sales tactic that an individual can use without disclosing it to or using it on his customer.

sound and personality are subjective dimensions, not intangible property owned by the employer). This makes it an ill-suited candidate to be a trade secret. Instead, it is better classified as general knowledge. *See Plains Cotton*, 807 F.2d at 1263 (the employee, upon terminating his employment relationship with his employer, is entitled to take with him the experience, memory, and skill which he gained while there employed). Summary judgment for this allegation is granted.

■ L. Bradbury uses the facts in nineteen to support its allegation that its garage door strategy, market research, profitability and the identities of garage door companies are trade secrets. The Court agrees that Bradbury's profitability in this market is a trade secret; however, the remaining allegations fall short of trade secret status.

Bradbury states that ATC did research about how to improve Bradbury's market dominance. There is a glaring lack of detail showing any facts about how this research was not readily ascertainable by the industry. Bradbury provides no documents or detailed facts showing the research or detailing the costs of such research. Likewise, identities of companies involved in the garage door market is not a trade secret because it is too generic. *See W. Forms, Inc. v. Pickell*, 308 F.3d 930, 934 (8th Cir.2002) (identity of customers in a specific market not a trade secret). Without any details it is impossible to support an allegation that this list was not readily ascertainable. Other than the vague research about market dominance and the identities of companies in this market, Bradbury fails to provide any facts specifically stating what is its secret garage door strategy. A trade secret cannot be established from such a generic and unsupported statements.

However, Bradbury does provide specific facts showing its profitability in the garage door market and how it derived this figure. Knowing a rival's profit margin in a competitive market can be valuable information. *See SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1260 (3d Cir.1985) (unlike product price, the profit margin, overhead, and labor is not information readily ascertainable by the industry).

Bradbury argues that ASC's entry in the integrated garage door market after having employed GOI is evidence that employees of GOI shared Bradbury's profit information. ASC argues that it was already in this market; so there was no misappropriation; however, this merely shows there is an issue of material fact. Viewing the facts in the light most favorable to the nonmovant, there is a genuine issue of material fact on whether Bradbury's profit information about the garage door market was misappropriated; therefore, summary judgment based is not granted.

■ M. Bradbury uses the facts in number twenty to support its allegation that the 12 Rules of Market Dominance as applied to the rollforming industry were a trade secret. The facts show these generic rules were adapted to the rollforming industry and kept confidential by Bradbury. Bradbury alleges that ATC disclosed its confidential and market specific rules to ASC; however, the facts state only that ATC disclosed the twelve rules of market dominance to ASC. The deposition testimony does not state whether ATC disclosed the rules as adapted to the rollforming business or the generic rules. Such a fact is a necessary to show misappropriation. The Court will not make the inference that because ASC is in the same business as Bradbury, ATC must have shared Bradbury's confidential rules instead of the generic and non-secret rules. The non-movant has not met its burden

and summary judgment is granted on this allegation.

■ N. Plaintiff cites the facts in number twenty-one as support for its allegation that its client information listing certain companies is a trade secret. Plaintiff fails meet its burden on summary judgment to provide sufficient facts to support the elements of their claim. Plaintiff does not produce a copy of the list, tell the Court specifically who was on it, or how much it cost to develop. Moreover, there is no allegation that this list was not generally ascertainable by the industry. The fact that college students helped with its development shows that this information was not secret. Plaintiff's unsupported allegation does not withstand summary judgment.

■ O. Bradbury cites the facts in numbers one, two and twenty-two to argue that market and competition research results are a trade secret. Bradbury provides facts showing that upon being employed by ASC, ATC did research for ASC. Bradbury also cites the non-disclosure agreement yet, it fails to cite to any fact showing that any of Bradbury's market or competition research was disclosed. Moreover, Plaintiff gives no details describing its trade secret. Other than the non-disclosure agreement, Plaintiff fails to make any connection between ATC's research for ASC in 2003 and Bradbury's unspecified trade secret. *See Integrated Cash Management Services, Inc. v. Digital Transactions,* 732 F.Supp. 370, 377 (S.D.N.Y.1989) (an employee who achieves technical expertise or general knowledge while in the employ of another may thereafter use that knowledge in competition with his former employer, so long as he does not use or disclose protected trade secrets in the process). Such a general allegation without supporting facts does not withstand summary judgment.

P. Bradbury cites the facts in number twenty-three to argue that the relative positions of Bradbury and ASC to compete is a trade secret. Much like the last allegation, this broad allegation is unsupported by any details which would justify trade secret status. Moreover, Bradbury has failed to meet its burden to provide sufficient facts showing that this information was not generally known or readily ascertainable. For these two reasons, summary judgment is granted.

■ Q. Bradbury cites to the facts in number twenty-four to argue that GOI's competitive assessments for Bradbury and later for ASC are trade secrets.

Bradbury's claim that its assessments were a trade secret fails because there is no supporting evidence. Bradbury tells the Court that assessments were done and nothing more. Detailed lists or studies may be trade secrets but general assertions without any supporting evidence is not a trade secret. *Cf. BioCore,* 96 F.Supp.2d at 1235 (detailed records regarding such information as purchasing patterns, sales volumes and payment histories may be a trade secret). Furthermore, Bradbury fails to put forth evidence showing how this information was not readily ascertainable to the industry. *Id.* at 1231 (Under the KUTSA, plaintiff must define the trade secret with the precision and particularity to separate it from the general skill and knowledge possessed by others). Indeed, the fact that college students helped prepare the assessments show that it was not secret and was readily ascertainable.

Bradbury provides absolutely no evidence showing how a competitive assessment performed by ATC for ASC about ASC is somehow Bradbury's trade secret. *See SI Handling,* 753 F.2d at 1262 (an employee's ability or experience is not a trade secret). A claim based on this far

reaching allegation cannot withstand summary judgment.

R. Bradbury cites the facts in number twenty-five to show that its market and competition intelligence, market share forecasts and assessments are a trade secret. Bradbury provides no evidence showing that these things were not readily ascertainable by the industry. Moreover, there is no evidence of misappropriation of Bradbury's market forecasts, assessments or intelligence.

■■■ Bradbury states that when GOI went to work for ASC, ATC did market share forecasts and assessments for ASC. This is not a misappropriation of a trade secret, as an individual's ability or experience or knowledge gained while working in an industry is not a trade secret. *SI Handling,* 753 F.2d at 1262; *see Integrated Cash,* 732 F.Supp. at 377 (an employee who achieves technical expertise or general knowledge while in the employ of another may thereafter use that knowledge in competition with his former employer, so long as he does not use or disclose protected trade secrets in the process). Bradbury has not met its burden and summary judgment is granted.

■■■ S. Bradbury cites the facts in number twenty-six to support its allegation that its confidential information about STI was misappropriated. Plaintiff provides no fact showing that ATC's actions were done on behalf of ASC or that ASC ever misappropriated this information. Plaintiff states that ATC's inquiry about the sale of STI must have been done to help ASC because ATC performed a similar service when he worked for Bradbury. (Pl.Ex. B–1–a–3 at 270: 1–5). This statement is entirely speculative. *See Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988) (a party cannot rest on speculation or suspicion to escape summary judgment in the

hope that something will turn up at trial). By asserting a claim without supporting facts, Plaintiff has failed to meet its burden; therefore, summary judgment is granted on this allegation.

## V. INJUNCTIVE RELIEF

Bradbury has shown that genuine issues of material fact exist for two of its trade secret allegations.[6] ASC's motion to dismiss Plaintiff's request for injunctive relief is denied as it is an avenue of relief under the KUTSA. Kan. Stat. Ann. § 60–3321(a).

## VI. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

■■■ When analyzing choice of law provisions in an action for tort, Kansas applies the rule of *lex loci delicti,* or the site of the injury. *Ling v. Jan's Liquors,* 703 P.2d 731, 735, 237 Kan. 629, 634 (1985). The injury in this case is financial. Bradbury is a Kansas corporation; therefore, the financial injury was felt in Kansas. *St. Paul Furniture Mfg. Co. v. Bergman,* 935 F.Supp. 1180, 1187 (D.Kan.1996). The parties also use Kansas law in their briefs; hence, the Court will apply Kansas law.

■■■ The essential elements for an action for tortious interference with a contract are: 1) a contract between plaintiff and a third party; 2) the wrongdoer's knowledge thereof; 3) the intentional procurement of its breach; 4) the absence of justification; and 5) damages resulting therefrom. *Dickens v. Snodgrass, Dunlap & Co.,* 872 P.2d 252, 257, 255 Kan. 164, 168 (1994).

Because summary judgment has already been granted with respect to Bradbury's no-compete covenant and the non-disclosure covenant under the theory of inevit-

---

**6.** See headings I and L under Section III for Misappropriation of Trade Secrets.

able disclosure, the Court will not address arguments relating to those claims. ASC claims it is entitled to summary judgment on Bradbury's tortious interference with contractual relations because: A) Bradbury, ATC and GPB did not have a non-disclosure contract; and B) there is no evidence that the duCros defendants breached their non-disclosure contract, or that ASC intentionally interfered with any of Bradbury's contractual rights or that ASC's actions proximately cause the duCross Defendants to breach to their non disclosure contracts.

### A. Existence of a contract

ASC argues that there is no evidence that such a non-disclosure contract existed between Bradbury, ATC or GPB. Bradbury argues that the 1994 and 1999 contracts include ATC and GPB as individual parties.

 "The fundamental rule in construing the effect of written instruments is that the intent and purpose of the parties be determined from an examination of the entire instrument or from its four corners. Thus, the language used anywhere in the instrument should be taken into consideration and construed in harmony with other provisions." *Heyen v. Hartnett,* 235 Kan. 117, 122, 679 P.2d 1152 (1984). "Whether ambiguity exists in an instrument is a matter of law to be decided by the court." *Mobile Acres, Inc. v. Kurata,* 211 Kan. 833, 839, 508 P.2d 889, 894 (1973). "The interpretation of a written contract which is free from ambiguity is a judicial function." *Hall v. Mullen,* 234 Kan. 1031, 1037, 678 P.2d 169 (1984).

 The Court holds that the 1994 document is a contract between GOB and Bradbury. Neither ATC nor GPB are individual parties to the contract. The document unambiguously supports this interpretation as GPB is not mentioned at all and ATC is mentioned only twice in the entire seven page contract. Moreover, statements throughout the contract consistently show that GOB and not GPB or ATC are parties to the 1994 agreement. These statements include:

> [t]his proposal is presented by Gean Overseas/Bossard, Inc. (G.O.B.)
>
> . . .
>
> [Bradbury] plans to retain G.O.B.'s services to conduct several permanent missions of a strategic nature
>
> . . .
>
> G.O.B.'s compensation for its work
>
> . . .
>
> G.O.B. is bound to respect confidentiality
>
> . . .
>
> G.O.B. is bound not to engage into any mission for a competitor . . .

(Doc. 206, Def.Ex. A).

Nor does the Court read the 1999 agreement to include ATC or GPB as individual parties. It is clear that the parties to the agreement are GOI and members of the Bradbury Group. Again, statements throughout the contract support this conclusion. These statements include:

> This proposal is presented to Bradbury Group by Gean Overseas (Gean), Inc.,
>
> . . .
>
> This proposal is a confidential document, which remains Gean's property
>
> . . .
>
> I. GEAN OVERSEAS'S GOALS, MISSIONS & TASKS
>
> . . .
>
> II. GEAN OVERSEAS'S GENERAL COMMITMENTS IN THIS ASSIGNMENT
>
> All data and documentation generated will be Bradbury Group's property. Gean Overseas will keep a copy of said document only as internal record, not to

be disclosed to any other party unless agreed with Bradbury Group...

. . .

Gean Overseas will disclose to a third party Bradbury Group's identity, strategy, plans, intentions, or know how only with Bradbury Group's permission, with the exception of what is considered as public knowledge about Bradbury Group, and which a third party would know anyway...

. . .

Gean Overseas will not disclose to Bradbury Group any proprietary or confidential information regarding Gean Overseas's other clients...

(Doc. 106, Def.Ex. C).

Moreover, while ATC is mentioned in the 1999 contract, he is not mentioned as a party to the agreement but rather as the President and employee of GOI. Under section three, titled "TEAM IN CHARGE", the contract states, "[t]his assignment will be undertaken by: Director: Dr. Andre R, Teissier-duCros (ATC), Gean Overseas's President." The contract also lists other people (including GPB), their roles and estimated time to be used on the project. Clearly, mentioning ATC and GPB in the contract does not make them parties to the contract itself, as they are mentioned only in the context of employees of GOI. Furthermore, ATC signed the 1999 agreement in his capacity as President of GOI. *See McFeeters v. Renollet*, 500 P.2d 47, 50, 210 Kan. 158, 162 (1972) (corporate officers are not individually liable upon contracts wherein the corporate name is signed and is followed by the name of an officer of the corporation to which are added words denoting his representative capacity); *see also Lentz Plumbing Co. v. Fee*, 679 P.2d 736, 742–743, 235 Kan. 266, 270 (1984) (An agent is not liable on a contract signed as agent for a disclosed principal).

Plaintiff argues ATC himself admits to being a party to the 1999 contract because he has asserted a counter claim for breach of the 1999 contract. There is no ambiguity about the parties to the contract; therefore, its interpretation is a matter of law based on the four corners of the instrument. ATC's allegations in this lawsuit are clearly not within those four corners.

Plaintiff uses language in the Court's previous orders to argue that the Court has already recognized that ATC was a party to these contracts. The Court's previous orders do not support Plaintiff's position. These orders recognized that ATC has filed a breach of contract counterclaim for the 1999 contract. (Doc. 126 at 2, 13); (Doc. 225 at 4). The Court did not address whether ATC was a party to the contract as that issue was not raised. However, while addressing an unrelated issue, the Court did mention that the parties to the 1994 agreement were Bradbury and GOB and the parties to the 1999 agreement were members of the Bradbury Group and GOI. (Doc. 126 at 23–24).

Bradbury argues that the facts in number four show the existence of non-disclosure contracts between Bradbury and ATC and GPB. However, this evidence shows ATC and GPB had access to confidential information and performed work for Bradbury; however, it fails to establish that ATC and GPB had individually entered into non-disclosure contracts with Bradbury.

Bradbury has failed to provide evidence showing a non-disclosure contract with GPB and ATC and summary judgment is granted for ASC on Bradbury's tortious interference of its non-disclosure covenants with ATC and GPB.[7]

7. The Court recognizes that ATC and GOI have filed for bankruptcy; therefore, this order does not interfere with their automatic stay. See (Doc. 279).

**B.** *Evidence showing a breach of non-disclosure contract, intentional interference and causation.*

ASC argues that there is no evidence of any breach of the non-disclosure contract nor can Plaintiff show ASC intentionally caused GOB and GOI to breach their non-disclosure contracts with Bradbury.

The Court denies movant's arguments. To determine if the non-disclosure contracts were breached, the Court must begin with the contract's terms. Both non-disclosure contracts provide terms describing what constitutes protected information; however, Defendant does not even cite the provisions of the two contracts, discuss the intended meaning of the contracts terms or specifically discuss the facts in relation to the contracts. The Court will not act as advocate for the parties or presume things which neither party has addressed.

IT IS THEREFORE ORDERED that Defendant ASC Motion for Summary Judgment (Doc. 215) be GRANTED in part and DENIED in part in accordance with the above provisions.